[Crim. No. 6877. Fourth Dist., Div. One. Oct. 6, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
DEE WILLIAM JOHN KILLMAN, Defendant and Appellant.

952

---

**COUNSEL**

J. Perry Langford and Alex Landon, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Conrad D. Petermann and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AULT, J.**—Defendant Dee William John Killman appeals from the judgment entered on jury verdicts finding him guilty of first degree robbery (Pen. Code, § 211) and possession of a concealable firearm by a felon (Pen. Code, § 12021). After denying a motion for new trial, the court sentenced defendant to prison on both counts for the term prescribed by law, the sentences to run concurrently to each other but consecutively to any incomplete prior terms. The judgment contains a finding, based on defendant's pretrial admission, that he had suffered five prior felony convictions. Killman was also charged with and tried for murder, but the jury was unable to reach a verdict as to that offense. It was later dismissed on motion of the prosecution.

Defendant contends:

(1) the evidence is insufficient to support his robbery conviction because his claim of innocent involvement was uncontradicted;

(2) the court abused its discretion by sentencing him without knowing what the minimum term would be with five priors;

(3) his admission of prior convictions was invalid under *In re Yurko*, 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 516]; and

(4) concurrent sentences for first degree robbery and possession of a firearm constitute double punishment.

At oral argument Killman's counsel also argued that the decision in *People* v. *Antick*, 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43], compelled a reversal of his convictions.

### FACTS

Willie Chappell conceived a plan to rob the Boulevard Card Room on El Cajon Boulevard in San Diego which he conveyed to defendant Killman. After driving to the area of the cardroom in Killman's pick-up truck, Chappell would enter and rob the cardroom while Killman waited in an adjacent bar. When the robbery was completed, Chappell would hide in a large tool box in the bed of Killman's truck, parked nearby. Later, after the excitement had subsided and the police had gone elsewhere to search for the robber, Killman would return to his truck and drive away with Chappell safe in the box.

The actual robbery was carried out as planned. About 4 p.m. on March 7, 1974 Killman drove Chappell to the parking lot behind the Boulevard Card Room and parked his truck; from there Chappell proceeded into the cardroom, armed with a .357 Magnum revolver which Killman had supplied. Killman went into the adjacent bar to wait. After standing about the cardroom for a few minutes, Chappell pulled out the gun, announced a robbery was in progress, collected wallets and money from the cash register, and then ran back to what he thought would be safety inside the tool box.

The plan fell apart when a neighbor witnessed Chappell's curious disappearing act and reported his location to the police investigating the robbery. The officers opened the tool box, found Chappell pointing his gun at them, and ordered him to drop the gun and get out. Chappell said, "Hell, no. You are going to have to kill me." and started to raise his arm. At that instant two officers fired at Chappell and killed him.

From the truck the officers removed the robbery loot, documents showing the vehicle was owned by Killman, and the gun which proved to be registered to Killman's former girlfriend, Christine Jacobs. They did not find the keys to the truck.

The sound of the shooting sent Killman running down the street to telephone Christine to ask her to pick him up at a restaurant located several blocks away. When she arrived, he told her Chappell had been shot, that her gun had been used in the robbery, and that, if the police should question her, she should say Chappell had either borrowed or stolen the gun. At no time during this conversation did Killman state he was coerced into assisting Chappell in the crime.

Christine had purchased the gun in December 1973 when Killman was living with her, using money he supplied. Soon after the purchase she and Killman used the gun several times for target practice. In late December Killman moved out, taking the gun with him to Chappell's house. At the time of the crime Killman was living there with a new girlfriend, Dora Cusenza, and kept the gun in a bedroom he occupied with Dora.

The information charged Killman with the murder of Chappell, armed robbery, and possession of a concealable firearm by a felon, all alleged to have been committed "on or about" March 7, 1974. It further alleged that Killman had suffered eight prior felony convictions for

which he had received a sentence: auto theft (Veh. Code, § 10851) in 1966; forgery (Pen. Code, § 470) in March 1968; and six other convictions in October 1968 for escape (Pen. Code, § 4530, subd. (b)), burglary (Pen. Code, § 459), two counts of kidnaping (Pen. Code, § 207), and two counts of armed robbery (Pen. Code, § 211). Before his jury trial Killman, while represented by counsel, admitted five of the charged prior convictions (auto theft, forgery, escape, burglary and one robbery). The three other alleged priors were stricken on motion of the prosecution.

At trial Killman testified in his own defense, claiming for the first time that he had acted under the duress of a threat of death from Willie Chappell. Asked why he had not disclosed the threat earlier, he said he feared harm to himself and Dora from either Chappell, from Chappell's brother who died before trial, or from some undefined "brotherhood." Asked on cross-examination whether he had thought Chappell would shoot him on the spot if he refused to drive the truck for Chappell, Killman replied: "He was in a funny state of mind. I can't really say. I wasn't about to say. The best I could feel I could do was try to talk him out of it, you know." Earlier he had blurted out: "Well, Willie Chappell never even made any threats."

Dora Cusenza had set the stage for Killman's coercion defense earlier in the trial when, testifying under subpoena for the prosecution, she claimed he had told her the night of the robbery that he "had to" drop Willie off at the cardroom. Asked why she waited until trial to disclose that Killman had been forced to participate, she replied, "This is the first time I have had the opportunity."

## DISCUSSION

### I.  SUFFICIENCY OF THE EVIDENCE of ROBBERY

Killman contends the evidence is insufficient to support his robbery conviction, arguing his claim of coercion was uncontradicted and the prosecution failed to establish he acted with guilty knowledge and intent. He relies on *People* v. *Hoover,* 12 Cal.3d 875, 882 [117 Cal.Rptr. 672, 528 P.2d 760], where evidence was held insufficient to raise an inference that an undercover agent was an accomplice and thus to require a jury instruction on accomplice testimony.

Killman's reliance on *Hoover* is misplaced. Here the evidence was more than sufficient to show his criminal intent. With advance knowledge of Chappell's robbery plan, he supplied Chappell's weapon and transportation to the scene. Whatever threat to his immediate safety Killman may have felt during the planning stage, he became a willing accomplice when he proceeded alone into the bar to wait until he could help Chappell escape. ■ The defense of duress requires proof of a threat of imminent violence; fear of future bodily harm does not suffice. (*People* v. *Lo Cicero,* 71 Cal.2d 1186, 1190-1191 [80 Cal.Rptr. 913, 459 P.2d 241]; *People* v. *Otis,* 174 Cal.App.2d 119, 125 [344 P.2d 342].) ■ Furthermore, Killman's claim of coercion, although not directly contradicted, was thoroughly discredited. By his own testimony he had lied to the police during the investigation and had been convicted of two prior felonies. From his unsatisfactory explanation of his and Dora's failure to mention coercion until mid-trial, the jury could reasonably conclude his entire story was a recent fabrication.

## II. The Prior Convictions

■ Killman contends the five prior convictions should be stricken from the judgment of conviction because he was not properly advised before admitting them. In *In re Yurko, supra,* 10 Cal.3d 857, the court held, before an accused admits he has suffered prior felony convictions, he is entitled to be advised of the specific constitutional protections waived by such admissions and also of the penalties and other sanctions which may be imposed as a consequence. To implement this holding the court announced as a judicially declared rule of criminal procedure: "[A]n accused, prior to the time the court accepts his admission of an allegation of a prior criminal conviction or convictions, is entitled to be advised: (1) that he may thereby be adjudged an habitual criminal pursuant to section 644 if that section is applicable in his case; (2) of the precise increase in the term or terms which might be imposed, if any, in the accused's case pursuant to section 644 or other applicable statutes (see, e.g., §§ 666, 667); and (3) of the effect of any increased term or terms of imprisonment on the accused's eligibility for parole. The failure to so advise an accused in the enumerated instances will constitute error which, if prejudice appears, will require the setting aside of a finding of the truth of an allegation of prior convictions." (*In re Yurko,* 10 Cal.3d 857, 864 [112 Cal.Rptr. 513, 519 P.2d 516].) Here the court fully advised Killman of the constitutional rights he would waive by admitting the alleged priors and also informed him of the two-year minimum term imposed by Penal Code section 3024. However, it failed to tell him that

the minimum term for violation of Penal Code section 12021 would be increased by 18 months (from 6 months under Pen. Code, § 18a to 2 years under Pen. Code § 3024). Killman contends the court thus erred in failing to advise him of the "precise increase" in his term, thereby invalidating his later admission of the priors.

Had Killman been convicted of the firearm charge only (Pen. Code, § 12021), there might be merit in his argument. However, he was also convicted of first degree robbery which carries a minimum term of five years (Pen. Code, § 213). Therefore, Killman suffered no actual prejudice by reason of the court's failure to advise him that admission of the priors would increase the minimum sentence he must serve for violation of Penal Code section 12021 from six months to two years. Prejudice must appear before a failure to comply with *Yurko* rules necessitates the setting aside of findings of the truth of allegations of prior convictions (*In re Yurko, supra,* 10 Cal.3d 857, 864).

■ Killman also contends the trial court abused its sentencing discretion and denied him due process by sentencing him to the term prescribed by law and then, without knowing what minimum term it was imposing, made the sentence run consecutive to any incompleted prior sentences.

The record is not entirely clear, but we find no denial of due process and no prejudice. Killman's trial counsel, apparently fearing Penal Code section 3024 required a two-year minimum term for *each* prior conviction, had requested the court to rule that the minimum would be two years even with five priors. The court declined to make the ruling, then imposed sentence, adding: "I don't make any finding with respect to that. We'll let the law take its course, whatever it is." While defendant views the remark as indicating uncertainty as to the minimum term required by statute, we view it as merely a casual comment on the indeterminate sentence procedure.

Any uncertainty as to the minimum term Killman might serve as the result of the sentence imposed arose because of his prior convictions. In fact, Killman's prior convictions have no effect upon the minimum term he will serve. Since he was convicted of and sentenced for first degree robbery which carries a minimum term of five years, none of the applicable provisions of Penal Code section 3024 operate to enhance that minimum term. If uncertainty existed, Killman suffered no prejudice because of it.

## III. DOUBLE PUNISHMENT

■ Killman was not subjected to double punishment in violation of Penal Code section 654 when sentenced to serve concurrent terms for first degree robbery and possession of the firearm. The two convictions were based on different acts, even though the information alleged both offenses were committed "on or about" the same date. The record shows Killman was convicted of first degree robbery for serving as the accomplice of an armed robber, and was convicted of violating Penal Code section 12021 for his own personal possession of the gun before the robbery. Thus, there was no double punishment (*People* v. *Coleman,* 32 Cal.App.3d 853, 858 [108 Cal.Rptr. 573]).

## IV. THE EFFECT OF PEOPLE *v.* ANTICK

■ Killman's claim that the recent opinion in *People* v. *Antick,* 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43], requires a reversal of his convictions is without merit. Antick's murder conviction, based upon the killing of his alleged accomplice in a gun battle with the police during which Antick was not present, was reversed. The court concluded that the only homicide which occurred was the justifiable killing of the accomplice by a police officer, and that Antick could not be held criminally responsible for the death under either the felony-murder doctrine or the theory of vicarious liability (*Antick, supra,* p. 91).

Although Killman was charged with murdering his accomplice, he was not convicted of the murder. The jury failed to agree on the murder charge, and it was later dismissed. While Antick's other convictions (burglary and assault with a deadly weapon) were also reversed, those reversals resulted from independent error directly affecting the charges and not from the fact he had been erroneously charged with and tried for murder (*Antick, supra,* p. 99).

We find no reasonable possibility the fact that Killman was also charged with and tried for murder tainted his conviction of robbery and possession of a firearm or adversely affected the formulation and presentation of his defense. Chappell was shot and killed by police officers, not by Killman, and his alleged responsibility for the death was based upon a tenuous theory of vicarious liability which some of the jury, at least, apparently refused to accept. Had Killman been tried for the robbery alone, the fact that the police had captured, shot and killed Chappell would still have come before the jury in the trial.

No inherent difficulty or conflicts resulted from the multiple charges. Under the facts, Killman's only conceivable defense to the murder was a claim of nonparticipation in the robbery. We find it difficult to believe he would not have presented the identical defense had he been charged with the robbery alone. Under the court's instructions, it was necessary for the jury to determine Killman's culpability for the robbery before even considering the question of his responsibility for the death of Chappell.

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied October 21, 1975, and appellant's petition for a hearing by the Supreme Court was denied December 4, 1975.