Opinion
 

 ROUSE, J.
 

 Defendant, David Barker, was charged by information with three felony violations of section 187 of the Penal Code: the murders of Floyd Braeseke, his wife, Barbara Braeseke, and Floyd’s father, John Braeseke, all in the same incident on August 23, 1976, in Alameda County, California. He entered a plea of not guilty to all three counts. A jury found him guilty of two counts of second degree murder for the killings of Floyd and Barbara Braeseke, and one count of first degree murder for the killing of John Braeseke. Following the denial of his motion for a new trial, defendant appealed from the judgment of conviction.
 
 [1]
 

 The evidence establishes that early in the morning of August 24, 1976, Alameda County sheriff’s deputies were summoned to the home of Floyd and Barbara Braeseke on Betlen Drive in Dublin, California. There they were met at the door by Barry Braeseke, the 20-year-old son of Floyd and Barbara, and were led inside to the family room, where they found the bodies of Floyd and Barbara Braeseke, and Floyd’s 81-year-old father, John Braeseke. All three were the victims of gunshot wounds in the head from a .22 caliber rifle. An autopsy revealed that the three victims had been shot early on the evening of August 23.
 

 At first, the deputies believed that the victims had been killed by burglars, since there were indications of a burglary in an upstairs bedroom, but they later discounted that theory when they found that there were no signs of forced entry and that many valuables remained untouched. The deputies also found expended .22 caliber shells on the
 
 *325
 
 family room floor, and a bloodstained chisel lying on a kitchen counter. Later investigation revealed that the blood on the chisel was of John Braeseke’s type, and that defendant David Barker’s fingerprint was on the chisel. Medical testimony at trial indicated that John Braeseke died of multiple gunshot wounds and blows to the head.
 

 After their initial investigation at the Braeseke house, the deputies interviewed Barry Braeseke as to what he knew about the killings. They then went to defendant’s residence in San Ramon early on the morning of August 24 to take his statement. The interview, which was recorded on tape, took place in the living room of the Barker home. Defendant’s mother and father were present during the interview. The deputies who conducted that interview testified that defendant’s appearance and demeanor were composed and that he gave them a fully exculpatory statement. Defendant’s statement was that he had spent the day of the killings with Barry Braeseke; that when they left Barry’s house that night the elder Braesekes were alive; and that they spent the night visiting friends and at the movies. After the interview the deputies left the residence. Later, having noted inconsistencies between defendant’s and Barry’s statements, the sheriff’s deputies returned and arrested defendant about 7 p.m. on August 24. Following defendant’s arrest and acting pursuant to a search warrant, the deputies searched defendant’s backyard and found certain objects taken from the Braeseke home on the night of the killings.
 

 At his trial, defendant testified that he was a close friend of Barry Braeseke. He said that they had first met about July 4, 1976, over citizens’ band radio, and had quickly developed a close relationship. Defendant saw Barry several times that summer and had occasion to meet Barry’s parents and grandfather. Barry and his father had a very stormy relationship, since the father objected to Barry’s use of drugs and his alleged homosexuality. Barry often talked of killing Floyd Braeseke, and even asked others, including defendant, to help. Apparently, Barry also did not think highly of his grandfather.
 

 As to the events of August 23, 1976, the day of the killings, defendant testified that he and Barry Braeseke met early that afternoon. They left the Barker house in San Ramon about 7 p.m. and went to the Braeseke residence in Dublin. While they were in the Braeseke garage, defendant and Barry talked of shared troubles, including debts and lack of money. Barry asked defendant to help him kill his parents that night, suggesting that he could get his parents’ money as a result. Defendant testified that
 
 *326
 
 he refused. That conversation broke up when Floyd Braeseke called Barry into the house, while defendant remained in the garage. Floyd and Barry then got into a heated argument, and upon his return to the garage, Barry began looking for tools with which to kill his father. He found a chisel, placed it inside a mug, and walked inside and upstairs to his bedroom, with defendant following. The two played a stereo and talked. Barry then went back downstairs for dinner with his parents and grandfather, but defendant remained upstairs, declining an invitation to join them for dinner. Barry returned 30 minutes later and pulled a .22 caliber rifle from his closet, loaded it, and replaced it in the closet. Barry and defendant then went downstairs to seek permission to go out for the evening. Defendant had planned that night to go for a job interview, then to the movies and later to work at a local ice cream store. After receiving permission to leave, Barry returned to his bedroom to get ready, and defendant remained downstairs watching television with Floyd, Barbara and John. Defendant was at a breakfast nook next to the kitchen, and the Braesekes were seated in the family room several feet away. As he went to pour himself a cup of coffee, defendant heard the shot that killed Floyd Braeseke, turned, heard Mrs. Braeseke scream “Oh, my God,” and saw Barry shoot his mother. Floyd lay dead in his chair, his feet still up on the ottoman, and Barbara lay dead on the floor, both victims of multiple gunshot wounds. Defendant then sat down at the table with his cup of coffee.
 

 According to defendant, the grandfather, John Braeseke, slept through the two shootings. Barry pulled the chisel out of his pocket and thrust it at defendant with instructions to hit John over the head with it. Defendant testified that he hit John over the head three, times, each time harder, but that he did so only because Barry “walked around with the gun pointing at me.” Between the second and third blows to John’s head, Barry struggled with his grandfather, threw him on the floor, waited until defendant hit John a third time, and then shot his grandfather.
 

 At this point, according to his testimony, defendant went upstairs, where he heard more shots from the family room below. Barry then followed defendant upstairs, and the two ransacked the master bedroom. Using a towel to prevent fingerprints, they took some valuables: Floyd’s and Barbara’s wallets, a jewelry box, and a clock. They wrapped the objects in some cloth and left the house, taking the rifle with them. They drove to a friend’s house in Hayward, but stopped along the way to wash some blood off Barry’s clothes. After leaving Hayward, they proceeded to an isolated area of Eden Canyon, where defendant threw the .22 caliber
 
 *327
 
 rifle over a bridge. They drove to another friend’s house in Castro Valley, and later returned to Dublin. In Dublin, they went to a local drive-in theater for a few hours; then Barry drove defendant home about midnight. As he left Barry’s car, defendant removed the objects taken earlier from the Braeseke home and put them in his backyard.
 

 In his testimony, defendant claimed that he had been coerced into participating in the killings; also, that when he was interviewed by the deputies early on August 24, he did not admit that he was present during the killings because he feared Barry would harm defendant’s parents, and he did not want to “make waves.”
 

 Defendant went to work with his mother on August 24, and did not reveal his involvement to her, nor did he express his concern for her or Mr. Barker’s safety. The defense produced testimony by a clinical psychologist that defendant was a passive, dependent person, and had little capacity for any kind of self-initiated aggression or violence.
 

 Defendant’s first contention on appeal is that the prosecutor committed reversible error when he cross-examined defendant regarding his postarrest silence. He asserts that
 
 Griffin
 
 v.
 
 California
 
 (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], and
 
 People
 
 v.
 
 Cockrell
 
 (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116], mandate reversal in this case.
 

 Defendant’s defense at trial was coercion. He argues that the prosecutor sought to establish an inference of his guilt in the jurors’ minds by repeatedly alluding to his earlier failure to assert his claim that he had been coerced by Barry Braeseke into aiding in the three killings.
 

 In addition to
 
 Griffin,
 
 defendant relies upon the case of
 
 Doyle
 
 v.
 
 Ohio
 
 (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], in support of his position; however, we believe that such reliance is misplaced in this instance.
 

 In both
 
 Griffin
 
 and
 
 Doyle,
 
 the United States Supreme Court held that, when a suspect has been given
 
 Miranda
 
 warnings, he has also been given an implied assurance that the exercise of his right to remain silent will carry no penalty. Thus, as a matter of due process and of fundamental fairness, the prosecutor should not be permitted to use the fact of the suspect’s silence against him at trial.
 
 (Doyle
 
 v.
 
 Ohio, supra,
 
 426 U.S. at p. 618 [49 L.Ed.2d at p. 422].) California has firmly embraced this federal constitutional standard.
 
 (People
 
 v.
 
 Haston
 
 (1968) 69 Cal.2d 233, 254-257
 
 *328
 
 [70 Cal.Rptr. 419, 444 P.2d 91];
 
 People
 
 v.
 
 Cockrell, supra,
 
 63 Cal.2d at pp. 669-670;
 
 People
 
 v.
 
 Andrews
 
 (1970) 14 Cal.App.3d 40, 47 [92 Cal.Rptr. 49];
 
 People
 
 v.
 
 Crawford
 
 (1967) 253 Cal.App.2d 524, 534-535 [61 Cal.Rptr. 472];
 
 People
 
 v.
 
 Maldonado
 
 (1966) 240 Cal.App.2d 812, 816-817 [50 Cal.Rptr. 45].)
 

 In
 
 Doyle
 
 v.
 
 Ohio, supra,
 
 426 U.S. 610, Doyle was tried on a narcotics charge and claimed for the first time at trial that he had been “framed.” Prior to trial he offered no explanation of his involvement. A state prosecutor sought to impeach Doyle’s exculpatory story with questions about his failure to assert the “frame-up” defense earlier. In reversing Doyle’s conviction, the court held that a state prosecutor may not seek to impeach a defendant’s exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving
 
 Miranda
 
 warnings at the time of his arrest. (P. 611 [49 L.Ed.2d at p. 94].)
 

 Defendant also relies upon
 
 People
 
 v.
 
 Andrews, supra,
 
 14 Cal.App.3d at page 47. In
 
 Andrews,
 
 the defendant remained silent until trial, when he then testified and asserted an exculpatory defense for the first time. The prosecutor’s cross-examination of the defendant regarding his post-arrest silence was held to constitute reversible error.
 

 Doyle
 
 and
 
 Andrews
 
 both involve factual situations quite different from the present case. In those cases, the defendant’s only version of events was his exculpatory story told for the first time at trial. In
 
 Doyle,
 
 the court concluded that comment on a defendant’s post-arrest silence under such circumstances is highly improper since “every post-arrest silence is insolubly ambiguous. . . .”
 
 (Doyle
 
 v.
 
 Ohio, supra,
 
 426 U.S. at p. 617 [49 L.Ed.2d at p. 97].)
 

 Therein lies the essential distinction between
 
 Doyle
 
 and
 
 Andrews
 
 on the one hand, and this case on the other.
 
 Doyle
 
 and
 
 Andrews
 
 held it constitutionally impermissible for a prosecutor to build a case based upon the fact that a defendant refused to talk to police. In this case, defendant did talk to the police. The prosecutor then sought to establish that the version which he gave to the police was totally inconsistent with his testimony at the trial.
 

 Defendant gave two different stories about his knowledge of the Braeseke killings. Before he was a suspect in the case, he voluntarily gave a fully exculpatory story to the police early on the morning after the
 
 *329
 
 killings. He had not been given a
 
 Miranda
 
 warning before participating in that interview because he was not then a suspect in the commission of the crimes. At trial, he asserted the coercion defense. The context of the challenged questions shows that, rather than an effort to “penalize” defendant for asserting his right to remain silent, the prosecutor highlighted defendant’s two inconsistent stories for the purpose of measuring his credibility. Thus, the situation differs perceptibly from
 
 Doyle
 
 and
 
 Andrews
 
 in that there was no “post-arrest silence” used to impeach defendant’s story of coercion, told for the first time at trial.
 

 Accordingly, at issue in this case is not an unconstitutional intrusion into defendant’s right to remain silent
 
 (Doyle
 
 v.
 
 Ohio, supra,
 
 426 U.S. 610), but the propriety of using defendant’s prior voluntary statement to impeach an inconsistent defense offered at trial. Since defendant’s first statement to the police was voluntary and subject to no constitutional infirmity, it was proper for the prosecutor to probe the inconsistency between defendant’s two stories.
 

 In
 
 People
 
 v.
 
 Farris
 
 (1977) 66 Cal.App.3d 376, 387-390 [136 Cal.Rptr. 45], which is factually similar to the instant case, the defendant waived his
 
 Miranda
 
 rights and gave the police several statements. He then asserted his
 
 Miranda
 
 rights, and was silent until he testified at trial to a version which implicated one Nettles in the crime. This testimony was inconsistent with his earlier story. The court distinguished the
 
 Doyle
 
 case and held that it was proper for the prosecution to cross-examine the defendant concerning his inconsistent stories. “The door to cross-examination as to why Nettles was not initially named was within the scope of the statement of activity and denial of responsibility in the killing given before appellant asserted his right to silence.” (P. 390.)
 

 People
 
 v.
 
 Love
 
 (1977) 75 Cal.App.3d 928 [142 Cal.Rptr. 532], involved a similar situation. The defendant waived his
 
 Miranda
 
 rights and failed to implicate one Walton when he gave his statement to the police. The defendant chose not to testify at trial, but his defense was that Walton had committed the crime.
 
 Doyle
 
 was again distinguished. The court stated that “his failure to mention Walton in his [voluntary, post-Miranda] statement could therefore properly be argued to the jury when his shared defense was that Walton had committed the crime.” (P. 934.)
 

 In this case, the cross-examination concerning defendant’s failure to assert his version of coercion, when he gave his voluntary exculpatory statement to the police, was “within the scope of the statement of activity
 
 *330
 
 and the denial of responsibility in the killing given before appellant asserted his right to silence.”
 
 (People
 
 v.
 
 Farris, supra,
 
 66 Cal.App.3d at p. 390.) We conclude that the prosecution did not violate the
 
 Doyle
 
 rule at defendant’s trial, and that defendant’s contention must therefore be rejected.
 
 [2]
 

 In any event, the Supreme Court in the
 
 Doyle
 
 case noted that where the state claims harmless error as a result of the prosecutor’s improper cross-examination, the error may be tolerated.
 
 (Doyle
 
 v.
 
 Ohio, supra,
 
 426 U.S. at pp. 619-620 [49 L.Ed.2d at pp. 98-99].) While there was no claim of harmless error in
 
 Doyle,
 
 the People do raise this argument in this case. Defendant argues that the error was not harmless since the prosecutor’s questions were a major part of the case. The applicable standard, where there has been an invasion of a constitutional right, is whether the error is “harmless beyond a reasonable doubt.”
 
 (Chapman
 
 v.
 
 California
 
 (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)
 

 The evidence revealed that defendant’s fingerprint was on the bloody chisel used to help kill John Braeseke, and that objects taken from the Braeseke home were found in defendant’s backyard. In view of the web of circumstantial evidence otherwise supporting the conviction, the prosecutor’s challenged conduct did not affect the outcome, and can be said to have been harmless beyond a reasonable doubt.
 

 Defendant also challenges the evidence at trial as insufficient to support a conviction of first degree murder in the killing of John Braeseke. He claims that his motion to dismiss at the close of the People’s case-in-chief was improperly denied. The evidence at that point shows that the police were given inconsistent statements by Barry Braeseke and defendant; that defendant had given a fully exculpatory version of events that night; that articles taken from the Braeseke house on the night of the killings were found in defendant’s backyard; and that defendant’s fingerprint was found on the bloody chisel. At that point, the evidence was sufficient for a reasonable jury to conclude that defendant was guilty of some criminal homicide, hence his motion under section 1118.1 of the Penal Code was properly denied.
 

 Defendant then argues that review under the substantial evidence test requires this court to find that the jury’s verdict of first degree
 
 *331
 
 murder was not supported by the evidence.
 
 (People
 
 v.
 
 Reyes
 
 (1974) 12 Cal.3d 486, 496-500 [116 Cal.Rptr. 217, 526 P.2d 225];
 
 People
 
 v.
 
 Redmond
 
 (1969) 71 Cal.2d 745 [79 Cal.Rptr. 529, 457 P.2d 321];
 
 People
 
 v.
 
 Anderson
 
 (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942];
 
 People
 
 v.
 
 Wolff
 
 (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].)
 

 On appeal, our analysis turns on whether there is substantial evidence to conclude that a reasonable jury could have found the prosecution’s case persuasive beyond a reasonable doubt.
 
 (People
 
 v.
 
 Reyes, supra,
 
 12 Cal.3d at pp. 496-497.) 'While the evdence on both sides must be measured
 
 (People
 
 v.
 
 Smith
 
 (1973) 33 Cal.App.3d 51, 62-63 [108 Cal.Rptr. 698]), the court must review the evidence in a light. most favorable to the People, and must presume the existence of every fact the jury could reasonably deduce from the evidence.
 
 (People
 
 v.
 
 Sedeno
 
 (1974) 10 Cal.3d 703, 712 [112 Cal.Rptr. 1, 518 P.2d 913];
 
 People
 
 v.
 
 Wolff supra,
 
 61 Cal.2d at pp. 818-819.) Finally, where proof is by circumstantial evidence, as in this case, the question is whether that proof “will furnish a
 
 reasonable foundation
 
 for an inference of premeditation and deliberation [citation], or whether it ‘leaves only to
 
 conjecture and surmise
 
 [that] conclusion. . . .’ ”
 
 (People
 
 v.
 
 Anderson, supra,
 
 at p. 25.)
 

 The proof must establish that the intent to kill was formed upon a “preexisting reflection” and was the result of “actual deliberation or forethought.”
 
 (People
 
 v.
 
 Thomas
 
 (1945) 25 Cal.2d 880, 900-901 [156 P.2d 7].) As the rule stands in
 
 Anderson,
 
 “The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did
 
 prior
 
 to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as ‘planning’ activity; (2) facts about the defendant’s
 
 prior
 
 relationship and/or conduct with the victim from which the jury could reasonably infer a ‘motive’ to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of ‘a pre-existing reflection’ and ‘careful thought and weighing of considerations’ rather than ‘mere unconsidered or rash impulse hastily executed’
 
 (People
 
 v.
 
 Thomas, supra,
 
 25 Cal.2d 880, at pp. 898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the
 
 manner
 
 of killing was so particular and exacting that the defendant must have intentionally killed according to a ‘preconceived design’ to take his victim’s life in a particular way for a ‘reason’ which the jury can reasonably infer from facts of type (1) or (2).
 

 
 *332
 
 “Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).”
 
 (People
 
 v.
 
 Anderson, supra,
 
 70 Cal.2d at pp. 26-27.)
 

 Defendant claims that the evidence is insufficient to establish either planning (type 1 evidence) or motive (type 2 evidence). However, there is strong circumstantial evidence of planning by defendant, which by itself is sufficient to find deliberation and premeditation
 
 (People
 
 v.
 
 Anderson, supra,
 
 at p. 27); and also evidence of a motive in conjunction with defendant’s planning.
 

 With regard to the issue of planning, the defendant testified that Barry often talked of killing his parents. On August 23, 1976, the day of the killings, defendant admitted sensing that Barry seriously intended to kill his parents that night. Although he had several opportunities that day to either leave the Braeseke premises or try to stop Barry, defendant did not leave and offered no resistance to Barry’s plan. The length of time during which an intent to kill is pondered may vary with the individual and the circumstances. The test is the ability of the defendant to maturely and meaningfully contemplate the gravity of his intended act.
 
 (People
 
 v.
 
 Sedeno, supra,
 
 10 Cal.3d at p. 713.)
 

 From the time in the garage when defendant first sensed Barry’s seriousness, through the search for the chisel and the loading of the .22 caliber rifle, through the shootings of Floyd and Barbara and the first two blows to John’s head, and through the struggle and the third blow to John’s head, defendant had ample time to “ponder” and “maturely and meaningfully contemplate” the gravity of the events that were transpiring. Since defendant remained with, and did not attempt to stop Bariy at any step, and because he joined in the assault that killed John Braeseke, the jury could reasonably infer that Barry’s plans were also defendant’s plans, and that defendant’s conduct prior to the actual killing showed that he “was engaged in activity directed toward, and explicable as intended to result in, the killing” of John Braeseke.
 
 (People
 
 v.
 
 Anderson, supra,
 
 70 Cal.2d at p. 26.)
 

 As for the existence of motive, the evidence established that defendant and Barry were close friends and that Floyd Braeseke was suspicious of the friendship. Defendant testified that Barry did not get along well with either his father or his grandfather and that defendant did not consider
 
 *333
 
 Floyd a very likeable person. Defendant and Barry often talked of living and traveling together and of existing on Floyd’s life insurance proceeds. The jury could reasonably conclude that the older Braesekes stood in the way of defendant’s and Barry’s plans; that defendant had assumed Barry’s animus towards his parents and grandfather; and that this was enough of a motive which would in turn support an inference that the killing was the result of a preexisting reflection and careful thought and weighing of considerations rather than mere unconsidered or rash impulse hastily executed.
 
 (Anderson, supra,
 
 at p. 27.)
 

 Defendant also maintains that his coercion defense, supported by the uncontradicted testimony of a clinical psychologist, rebuts the sufficiency of the evidence. The People question defendant’s duress defense, and claim that section 26, subdivision 8 (now subd. 7) of the Penal Code precludes such a defense in this case. There is no need to reach the merits of the People’s argument. Assuming
 
 arguendo
 
 that coercion was a proper defense in this case, it has been held that a coercion defense, although uncontradicted, can be totally discredited by a defendant’s testimony that he lied to the police during the investigation.
 
 (People
 
 v.
 
 Killman
 
 (1975) 51 Cal.App.3d 951, 957 [124 Cal.Rptr. 673].) Defendant admitted that he lied to the police during his statement in the early morning of August 24, 1976.
 

 The jury was instructed on the threat and menace defense, and there is substantial evidence of defendant’s conduct before, during and after John’s killing to support the jury’s rejection of his defense. Accordingly, we find that there was sufficient evidence to support the jury’s verdict of first degree murder.
 

 Defendant’s final contention is that the trial court erred in allowing prosecution witnesses to testify as to specific acts of conduct regarding defendant’s character. Defendant sought to establish his gentle, nonaggressive character by testimony that he was a prize-winning member of the 4-H Club who was not cruel to animals. The prosecution sought to rebut this evidence with testimony regarding defendant’s reputation for cruelty to animals. Defendant objects to additional prosecution rebuttal testimony by Lynn Kayler and Larry Gritsch as to specific acts showing defendant’s cruelty to animals. The Kayler/Gritsch testimony detailed defendant’s torture of chickens, and defendant claims
 

 
 *334
 
 that this was inflammatory, prejudicial and improper under section 1102 of the Evidence Code.
 
 [3]
 

 The Law Revision Commission comment to section 1102 of the Evidence Code states that generally, evidence of specific acts by the defendant is inadmissible to prove his guilt even though the defendant has opened the question by introducing evidence of his good character. Here, there was little probative value in the prosecution’s additional rebuttal testimony by Kayler and Gritsch. The prosecution had previously offered two rebuttal witnesses on the same issue of defendant’s quiet and gentle character. The Kayler/Gritsch testimony was merely cumulative, only indirectly relevant and completely unnecessary to the prosecution’s case.
 

 The People argue that even if the testimony was improper, it was harmless error. A miscarriage of justice should be declared only when, after a review of all the evidence, including the challenged testimony, the court concludes with reasonable probability that, absent the improper evidence, defendant would have prevailed.
 
 (People
 
 v.
 
 Wagner
 
 (1975) 13 Cal.3d 612, 620 [119 Cal.Rptr. 457, 532 P.2d 105];
 
 People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Here, defendant’s guilt or innocence did not turn on his character or gentleness and care in treating animals. This was a minor and irrelevant consideration in the entire defense of coercion. In view of the substantial web of circumstantial evidence otherwise supporting the jury’s conclusion, the admission of such evidence was not reversible error.
 

 Defendant’s purported appeal from the denial of his motion for new trial is dismissed. The judgment is affirmed.
 

 Taylor, P. J., and Miller, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied August 29, 1979.
 

 [1]
 

 Defendant also purports to appeal from the order denying his motion for new trial, which is nonappealable but reviewable on appeal from the judgment of conviction.
 

 [2]
 

 Although
 
 Farris
 
 and
 
 Love
 
 involved post
 
 -Miranda
 
 voluntary statements, we see no reason why the principle expressed therein should not also apply to
 
 pre-Miranda
 
 voluntary statements.
 

 [3]
 

 Section 1102 of the Evidence Code provides, in part, that “In a criminal action, evidence of the defendant’s character or . . . evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [H] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character. [H] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a).”