Filed 4/6/15  P. v. Askew CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C076394 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 62112964, 62116640) |
| v. | |
| THOMAS SPENCER ASKEW, | |
| Defendant and Appellant. | |

Defendant Thomas Spencer Askew and the victim, Richard Houser, were both patrons at an Auburn bar and each carrying a knife when they encountered one another in the men's restroom.  Both testified the other had been giving him dirty looks throughout the evening.  Houser testified defendant stabbed him in the neck because he would not tell him his name; defendant testified he pulled his knife in self-defense.  Faced with the victim's testimony that he did not take out his knife, contradicted by the testimony of the witnesses that he did, and with defendant's testimony that the victim had been the aggressor, contradicted by evidence that defendant ran out of the bar, tossed his knife with the victim's blood on it, and was hiding behind a dumpster when arrested, a jury

1

found defendant guilty of assault with a deadly weapon but also found the great bodily harm enhancement allegation not true. Defendant admitted he had suffered a prior strike conviction and a prior serious felony conviction, had served a prior prison term, and had committed the charged offense while out on bail. He reached a plea agreement on another case and as part of the agreement pleaded no contest to a single count of infliction of corporal injury upon a cohabitant. (Pen. Code, § 273.5, subd. (a).)

The sole issue on appeal is whether the prosecutor, with the trial court's blessing, violated defendant's right to due process by eliciting testimony that he had failed to tell police he stabbed Houser in self-defense, by cross-examining defendant on his failure to tell police he stabbed Houser in self-defense, and by commenting during argument on defendant's silence. (*Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*).) Only one of the alleged *Doyle* errors during the prosecutor's examination could have possibly deprived defendant of due process, and the one " 'brief and mild' " query by the prosecutor that might be characterized as a *Doyle* transgression was harmless beyond a reasonable doubt. (*People v. Crandell* (1988) 46 Cal.3d 833, 879 (*Crandell*).) The judgment therefore is affirmed.

## FACTS

### *Facts Related to the Commission of the Offenses*

Few additional facts about the commission of the assault are relevant to our disposition of the asserted *Doyle* error. Our attention, therefore, is focused on the facts involving the alleged *Doyle* errors.

The bartenders knew Houser because he had been helping out at the bar for a couple of months before the assault, hoping to get a job. One of the bartenders testified she served him one beer on the evening of September 3, 2012. The bartenders did not know defendant. He, too, was at the bar on September 3, and depending on whom the jury believed, he consumed several beers at home earlier and one or two drinks at the bar. Houser and defendant encountered each other in the men's restroom about 12:30 a.m.

2

They were the only witnesses to what occurred in the restroom, and as mentioned above, each testified that the other was the aggressor.

Angry and afraid, Houser emerged with blood shooting out of his neck. A bartender trainee saw him with one hand grabbing his neck and the other holding a knife. A bartender saw him with both hands raised and no knife. But a short while later, she did see a knife in his hand and she took it from him. She forgot about the knife when she was interviewed by the police but gave it to a friend of Houser. She believed the knife was not relevant because Houser had not mentioned it when he told her what happened. Houser testified that he never took out a tiny knife he had in his pocket. Houser's wound was one to one and one-half inches deep. The emergency room doctor opined that Houser was somewhat intoxicated.

The police and medical aid arrived. The police found defendant, who weighed nearly 300 pounds at the time, behind a nearby dumpster. One of the bartenders identified defendant in an in-field showup. What defendant did and did not tell the police officers comes later. He had a cut on one finger and was "slightly unsteady on his feet." At trial, he testified that Houser attacked him in the bathroom with a knife, and he pulled out his knife only after he saw that Houser was holding a knife at the side of his leg. He ran out of the bathroom and fled through the back patio, fearing that if he stayed, one of the men would kill the other. He testified he acted only in self-defense. The police located the knife defendant had tossed near another dumpster. The parties stipulated that DNA testing from the knife showed Houser's blood and defendant's fingerprint.

Defendant's ex-girlfriend, Samantha Foreman, testified he was always violent, whether he drank or not, but he was more violent when he was drinking. On April 2, 2012, defendant was drunk. He grabbed Foreman by the throat and held her against the wall, leaving bruises. In surrebuttal, Foreman's neighbor and friend testified that Foreman was a regular drug abuser. According to her friend, she physically abused defendant on at least two occasions and did not appear fearful of him as she was doing it.

3

*Facts Involving Alleged* **Doyle** *Errors*

**The Prosecutor's Examination of Officer Neher**

Tyler Neher, a recent graduate of the police academy and a police officer in training, was one of the two officers who went to look at defendant after another officer found him behind the dumpster. Defendant told Officer Neher he "was just behind the dumpster sleeping at Bicentennial Park and that we had detained the wrong individual." Defendant then told the officers that he wanted to be transported to the jail so he could speak with his lawyer and prove his innocence. Defense counsel cross-examined Officer Neher extensively about whether other witnesses had told him that Houser was wielding a knife. On redirect, the prosecutor asked, "At any point in time did the defendant tell you that the victim had a knife?" The officer responded, "He did not." Defense counsel's objection was overruled.

**The Prosecutor's Cross-examination of Defendant**

During cross-examination, the prosecutor asked in several different ways whether defendant had fallen asleep just after fleeing for his life and whether he told the police officers that Houser had attacked him, or about his near escape or the fact Houser might still be there. Defendant stated repeatedly he had not. Finally the prosecutor asked, "[Y]ou don't feel the need to tell [the officers] what happened?" After the court overruled a defense objection, defendant responded, "No, I did not."

**The Prosecutor's Argument**

The prosecutor quoted CALCRIM No. 362 and argued: "If the defendant made a false statement, false or misleading statement related to the charged crime, knowing that the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining the guilt.

"You got the wrong guy. You got the wrong guy, saying it wasn't me. When the defendant was on the stand, I asked him, I go, you had the opportunity to tell the officers that you were just in the bar, that someone attacked you and then you fled. He didn't say

4

that. Does that make sense? If you are truly in fear of your life and you fled and you ran and you have hidden behind a dumpster, wouldn't you be relieved when the officers are there? As soon as you see an officer, would you be like, I am so happy you are here. You don't know what just happened. I was in the bathroom, this guy came at me with a knife. It was all a cluster. I can't remember everything, and I just ran, but he has a knife. No. That is not what he said when he was given that opportunity.

"Deputy Garbutt said as soon as he came out from behind the dumpster, he said I was sleeping. I was sleeping behind the dumpster.

"And Officer Neher later on talked to him again and again he says, no, I was just sleeping behind the dumpster. You got the wrong guy.

"And when asked about that, about that statement, defendant was like, yeah, I did fall asleep. I just had probably the scare of my life when someone tried to stab me, I got into a struggle, I pulled out my knife, may or may not have stabbed him, ran out the back, went over to a different property, threw my knife, kicked down a gate, ran a couple of hundred yards to the dumpster, adrenaline going, pumped up, excited, and I fell asleep. Think about it. Does that make sense? You get that shot of adrenaline and near death experience happens. The fight or flight instinct kicks in."

In final summation, the prosecutor returned to the same theme. He argued, "The cops come. What is the most reasonable thing you do if you just got attacked by someone with a knife? Hey, Officer, I was just at the California Club. This guy pulled a knife out in the bathroom. I am glad you are here. Nope. Got the wrong guy. I was sleeping behind the dumpster."

He later reiterated the same basic argument as follows: "Go back, look at the evidence. Is it reasonable to believe that a 300-pound man is agile enough to move out of the way of a tight area, grab his knife out, struggle, stab him, then run, take the only weapon that he has already had to use to defend his life, toss it, and then run the rest of the way up to the garbage cans, hide and then when contacted by officers, first sign of

5

safety, say you got the wrong guy? I was just sleeping behind the dumpster. It is not, ladies and gentlemen, it is not reasonable."

## DISCUSSION

"In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony." (*People v. Collins* (2010) 49 Cal.4th 175, 203 (*Collins*).) "[S]uch impeachment [is] fundamentally unfair because Miranda warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him." (*Anderson v. Charles* (1980) 447 U.S. 404, 407-408 [65 L.Ed.2d 222] (*Anderson*).) "To establish a violation of due process under *Doyle*, the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument. . . .

"An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument." (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.)

There is no question that the prosecutor exploited defendant's failure to raise his claim of self-defense on the night he was apprehended behind the dumpster. As demonstrated above, he elicited testimony from the officers, cross-examined defendant, and argued vehemently that a person who had been assaulted with a knife would not have run for his life and then settled in for a nap behind a dumpster. Nor, he argued, would a victim, when found hiding behind the dumpster, tell the police they had the "wrong guy" but not tell them that his assailant had threatened him with a knife. But there is a huge gap in defendant's argument that he was denied due process because the prosecutor thereby committed a series of *Doyle* errors—he volunteered the statements used to impeach him before the police recited his *Miranda* rights, including his right to remain silent. Several cases clearly distinguish pre-*Miranda* silence from post-*Miranda* silence

6

and exempt pre-*Miranda* silence from the *Doyle* prohibition against using a defendant's failure to offer a defense earlier to impeach him.

In *People v. Barker* (1979) 94 Cal.App.3d 321, 328 (*Barker*) the defendant, before he was a suspect, voluntarily gave a fully exculpatory story to the police. Because he was not a suspect, he had not been given a *Miranda* warning. (*Barker*, at p. 329.) The court held the prosecution had not sought to penalize the defendant for invoking his right to silence, as in *Doyle*, but had sought to highlight the defendant's two inconsistent stories. There simply was no postarrest silence used to impeach the defendant's story of coercion, a story offered for the first time at trial. (*Barker*, at p. 329.)

The court concluded: "Accordingly, at issue in this case is not an unconstitutional intrusion into defendant's right to remain silent (*Doyle* v. *Ohio*, *supra*, 426 U.S. 610), but the propriety of using defendant's prior voluntary statement to impeach an inconsistent defense offered at trial. Since defendant's first statement to the police was voluntary and subject to no constitutional infirmity, it was proper for the prosecutor to probe the inconsistency between defendant's two stories." (*Barker*, *supra*, 94 Cal.App.3d at p. 329.)

Similarly, in *People v. Burton* (1981) 117 Cal.App.3d 382, the defendant claimed *Doyle* error when the prosecutor asked the officer whether he had come forward to give any explanation about his involvement in the incident. The issue presented was whether a defendant's prearrest silence may be utilized to impeach him without violating his constitutional rights to due process and to remain silent. (*Burton*, at p. 386.) Since there was no governmental inducement to remain silent before arrest, the court found no fundamental unfairness and concluded "the use of prearrest silence to impeach a defendant's credibility violates neither the Fifth Amendment nor the due process clause of the Fourteenth Amendment." (*Burton*, at pp. 386-387.)

The same principles were at play before the United States Supreme Court in *Anderson*, *supra*, 447 U.S. 404, although the facts were slightly different. In *Anderson*,

7

the defendant voluntarily made statements to the police *after* he was arrested and given his *Miranda* warnings. The Supreme Court again went right to the heart of the *Doyle* rationale—there was no unfair use of the defendant's silence because the defendant had spoken voluntarily after receiving his *Miranda* warnings and therefore had not been induced to remain silent. (*Anderson*, at p. 408.)

And this same distinction was also made in *Collins*, *supra*, 49 Cal.4th 175. There, as in *Anderson*, the defendant did not remain silent in response to the *Miranda* warnings. He, too, provided a variety of explanations about his whereabouts at the time of the murder, all of which differed from his trial testimony. (*Collins*, at p. 204.) The California Supreme Court adopted the *Anderson* rationale that the prosecutor's solicitations referred to the defendant's silence only insofar as his inconsistent description omitted facts included in other versions of his whereabouts. (*Collins*, at p. 204.) A defendant's voluntary inconsistent statements, far from being induced by the government's assurance that the right to remain silent will be honored, do not infringe on the constitutional rights sought to be protected by *Doyle.*

We turn then to a careful inspection of the questions posed by the prosecutor and the comments he made during argument, which in defendant's view constitute *Doyle* error. We will not "parse the prosecutor's" examinations or argument; rather, we will examine his questions and comments in the context in which they were delivered. (*Collins*, *supra*, 49 Cal.4th at p. 204; see *Anderson*, *supra*, 447 U.S. at p. 408.)

The prosecutor returned again and again to the same theme. In argument, he asked the jurors to use their common sense and reject the notion that someone who had been attacked with a knife would fall asleep behind a dumpster and, rather than telling them he acted in self-defense, would tell the police they had the wrong guy. During cross-examination of defendant, he challenged defendant with the same incongruity. Under the authorities discussed above, the argument and cross-examination were entirely proper because the prosecutor's impeachment referred to the prearrest, pre-*Miranda* voluntary

8

statements defendant made when first confronted by the police behind the dumpster. The government at that point had done nothing to induce his silence, and there is nothing inherently unfair about using the voluntary statement defendant blurted out before he was arrested or Mirandized.

There is only one brief question that might transgress *Doyle*. During the redirect examination of Officer Neher, the prosecutor asked the arguably open-ended question, "At any point in time did the defendant tell you that the victim had a knife?" As to this question, defense counsel objected.[1] Although the court believed the question was getting close to proscribed territory, it overruled the objection. The Attorney General argues that the question, in context, referred to the time period when the officers first confronted defendant. We need not quibble whether this "brief," "mild," and "fleeting" question constituted *Doyle* error in and of itself because even if we assume there was error, it is manifestly harmless beyond a reasonable doubt. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 66; *Crandell*, *supra*, 46 Cal.3d at p. 879; *People v. Hinton* (2006) 37 Cal.4th 839, 868.)

We acknowledge that a single question can constitute *Doyle* error if it seeks to exploit the defendant's invocation of his right to silence after proper advisement. (*People v. Evans* (1994) 25 Cal.App.4th 358, 368.) Defendant contends that his case is strikingly similar to *Evans* because the prosecutor's use of the phrase "at any point in time" impeached defendant, not only with what he failed to say before he was Mirandized, but with what he failed to say after he was Mirandized as well. Defendant exaggerates the potential impact of the one, slightly overbroad question in light of all the

---

[1] Defendant claims he did not receive adequate representation by counsel for failing to object to numerous other *Doyle* errors committed by the prosecutor. Because we find that none of the other questions or argument by the prosecutor constitute *Doyle* error, we need not address his inadequacy of counsel claim.

other questioning and argument by the prosecutor. At every other opportunity, the prosecutor carefully confined his questions and argument to the statement defendant volunteered as soon as the police arrived. He did not, as the prosecutor did in *Doyle* and its progeny, unfairly penalize defendant for exercising his right to remain silent as he kept the focus so consistently on defendant's failure to tell the officers as soon as they appeared at the dumpster that he had been attacked and was defending himself when he pulled out a knife. We conclude, as the Supreme Court did in *Coffman and Marlow*, *Crandell*, and *Hinton*, that the prosecutor's brief, mild, and fleeting reference could not have affected the jury verdict in this case and was harmless beyond a reasonable doubt.

We note that our conclusion that the single question was harmless beyond a reasonable doubt is predicated on our assessment of the unlikelihood the question affected the jury and not on an assessment of the weight of the evidence in this case. The Attorney General denigrates the strength of the defense and inflates the prosecution's case by ignoring evidence that impeached the victim's testimony he never took out his knife and had only one beer that night, as well as the jury's anomalous verdict. While we cannot speculate on the inferences the jury must have drawn to arrive at a verdict in which an assailant who stabs a victim in the neck with a knife is guilty of assault with a deadly weapon but at the same time finds a great bodily harm enhancement not true in spite of evidence that the wound was one to one and one-half inches deep, blood was squirting profusely from the victim's neck, he was hospitalized, and he required several stitches, we reject the Attorney General's prejudice analysis. Whether or not the evidence to support the verdict was merely sufficient or overwhelming simply does not factor into our consideration whether, in context, the prosecutor's question could have affected the verdict. We conclude it could not have affected the jury verdict and therefore any conceivable *Doyle* error is harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

10

                                    _____RAYE_____, P. J.


We concur:



_____BLEASE_____, J.



_____MURRAY_____, J.