[Crim. No. 33181. Second Dist., Div. Four. July 30, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ELTON ANTHONY BOYD, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Joseph Levine, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Sandy R. Kriegler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—By a second amended information, defendant[1] was charged in count I with having committed the offense of murder on August 29, 1977, in violation of Penal Code section 187. The victim of the alleged murder was Vernita Curtis. In count III[2] defendant was charged with committing the offense of burglary on August 29, 1977, in violation of Penal Code section 459. It was alleged that defendant committed the burglary by entering the residence of Vernita Curtis, the alleged victim of the murder charge set forth in count I.

Defendant entered pleas of not guilty to the two charges. Trial was by jury. Defendant was found guilty of murder and burglary as charged in the second amended information and the jury further found each offense to be of the first degree. Defendant's motion for new trial was denied and he was sentenced to state prison for life on the murder conviction. On the

---

[1]Earl Lloyd Jackson was named as a codefendant in count I. Jackson, however, was not tried with defendant.

[2]Count II of the second amended information charged codefendant Jackson individually with having committed a separate murder on a different date.

burglary conviction defendant was sentenced to four years in prison, with execution of that sentence stayed pending any appeal, and with the stay to become permanent upon completion of the sentence on the murder conviction.

 Defendant has appealed from the judgment of conviction and from the order denying his motion for new trial.[3]

I

*The Factual Background*

The evidence indicates that, on August 28, 1977, defendant told Ilena Gaines, with whom he lived in an upstairs apartment of an apartment building in Long Beach, that he was going to make some money. He refused to say, however, how he planned to make this money. Defendant left the apartment shortly thereafter.

On August 29, 1977, a neighbor of Vernita Curtis, an elderly woman, who lived in a downstairs apartment of the same apartment building where defendant lived, went to Vernita's apartment as a result of a request made by Vernita's daughter. The neighbor entered Vernita's apartment and observed her lying unconscious in the bedroom. Several items of personal property appeared to be missing. Vernita was transported to a hospital by paramedics. The physician on duty in the emergency room observed Vernita to be unconscious with injuries to the face, neck, stomach and rib cage. In the physician's opinion, the injuries appeared to have been caused within a period of 24 hours of his observation.

On the morning of August 29, 1977, Ilena asked defendant what he had obtained the night before. Defendant stated that he had gotten a vacuum and a microwave oven which he was going to sell. Defendant told Ilena that he had obtained these items from the old lady's apartment downstairs. In the late afternoon of August 29, Ilena observed the arrival of an ambulance at the Vernita Curtis apartment. While the ambulance was still on the premises, defendant told Ilena that he knew who killed the lady downstairs and that it was Lloyd—meaning Lloyd Jackson, who lived in the apartment next to that of Ilena's and defendant's.

---

[3]The order denying a motion for new trial is not an appealable order. (Pen. Code, § 1237.) The attempted appeal therefrom must be dismissed. (*People* v. *Henderson* (1977) 19 Cal.3d 86, 90, fn. 3 [137 Cal.Rptr. 1, 560 P.2d 1180].)

While the ambulance was still on the premises, Ilena heard Jackson say: "I did that," referring to the victim Vernita. Ilena also testified that after Vernita had been taken to the hospital, defendant told her that Jackson had killed the victim because the victim was able to identify him.

The granddaughter of the victim testified that she visited the hospital on August 29, at around 8:15 p.m. She gave a description of her grandmother, Vernita Curtis, in terms that she looked almost inhuman, with her eyes looking like two big black golf balls; that her lip was swollen up to her nose and that there were markings like fingerprints on her neck as if she had been strangled.

Vernita Curtis, the victim, died at the hospital on September 4, 1977. A deputy medical examiner of the Los Angeles County Coroner's office performed an autopsy upon the victim and testified that the cause of death was determined to be multiple injuries to the head and neck area caused by blunt force which could have been inflicted by the hands as well as by some object. The deputy medical examiner stated that the victim's face and neck showed blotchy areas of hemorrhaging and bruising.

Defendant was arrested at his apartment on September 17, 1977. After being advised of his constitutional rights, defendant waived his rights and had several conversations with the police. Defendant gave the police the following version of events: Defendant and Jackson needed money and decided to burglarize the residence of Vernita Curtis, who lived in the downstairs apartment. He and Jackson entered Vernita's apartment and began stacking up items of property to take from the apartment. The property included a vacuum cleaner, a small portable oven and two televisions. The victim woke up and walked into the living room and screamed. Jackson then began punching and hitting the victim until she fell to the floor. The light was on when the victim came in. After Jackson began hitting the victim, he, the defendant, went over to another part of the room and turned the light off.

Defendant also said that, after the victim fell, he lifted her up and carried her into the bedroom; that at this time she was alive and her eyes were open. He stated that he noticed red marks all over the victim's face and that he would describe them as welts, not bruises. Defendant and Jackson then took the items which they had stacked up and hid them in the alley behind a trash can.

Defendant told the police officer that after hiding the items of property in the alley, he and Jackson started back upstairs to their apartments, but that Jackson left him and went back into the victim's apartment. Jackson later told defendant that he, Jackson, was sure that the victim had recognized him and that's why he went back. Defendant said that about three days later Jackson told him that he had taken care of business— meaning that he possibly killed the victim. According to the police officer, defendant stated that, as he was ascending the stairs, he turned around and saw Jackson reenter the victim's apartment through the front door.

Defendant did not testify, but after the prosecution had rested its case, the prosecutor and defense counsel stipulated that Deborah Hall was deemed to have testified that she was a cousin of Jackson and that in a conversation with him in September 1977, Jackson pointed to a newspaper article regarding the murder of Vernita Curtis and said: "I did that." It was further stipulated that codefendant Jackson be deemed to have been called to testify and asked whether he killed the victim and that he refused to testify on the ground of self-incrimination.

## II

### Defendant's Contentions With Respect to Errors Occurring at the Trial

Defendant asserts that the following errors occurred at the trial: (1) that the jury viewed an inadmissible document indicating defendant's potential involvement in a nonrelated homicide and thus deprived defendant of his right to a fair trial; (2) that the trial court committed prejudicial error in admitting into evidence two gruesome color photographs; and (3) that the trial court erred in not allowing defendant credit for 124 days for work time and good time while he was confined in the county jail.

## III

### The Effect of the Jury's View While in the Jury Box of an Inadmissible Document

It is undisputed that while defendant's tape-recorded statement was being played for the jury, the jury was furnished with a transcript of the tape. Inadvertently, there was attached to the transcript as a first page a copy of a police investigation face sheet indicating the names of four suspects, including defendant, and two separate murder victims, one of

which was Vernita Curtis. After the tape recording was played, the jurors returned the copies of the transcript with the police report face sheet. The police report face sheet was subsequently removed from a copy of the transcript of defendant's taped statements, and this copy was admitted into evidence by stipulation and taken to the jury room during the jury's deliberations.

It is the defendant's contention that the jury's possession of the inadmissible police report face sheet which implicated defendant in a second murder, created a presumption of prejudice, whether any jurors read the document or not, and thus deprived defendant of his right to a fair trial.

A. *What Constitutes Jury Misconduct or the Jury's Receipt of Material Not Admitted Into Evidence to Create the Rebuttable Presumption of Prejudice?*

Defendant relies upon *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050], in which the court observed: "It is well settled that a presumption of prejudice arises from any juror misconduct. In an early case we said: 'For, when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears.' [Citation.] We have often restated the presumption. [Citations.]"

In *People* v. *Kitt* (1978) 83 Cal.App.3d 834 [148 Cal.Rptr. 447], the court had occasion to observe: "Even though the jury's observation of these photographs was not intentional, the fact that the photographs were actually observed by jurors falls under the category of juror misconduct. . . . *Honeycutt* [*supra*] points out various instances of juror misconduct that have required a reversal of a conviction because of the presumption of prejudice and the absence of evidence to rebut this presumption. These instances included the presence of an alternate juror during deliberations, even though no words were spoken by such juror (*People* v. *Britton* (1935) 4 Cal.2d 622 [52 P.2d 217, 102 A.L.R. 1065]), and the reading by jurors of newspaper accounts of trial proceedings and communications by the jurors and bailiffs of an unauthorized nature (*People* v. *Wong Loung* (1911) 159 Cal. 520 [114 P. 829]). The juror misconduct in *Honeycutt* involved the foreman's obtaining from an outside attorney information regarding the law." (*Kitt, supra,* 83 Cal.App.3d 834, 850.)

The People argue that the issue presented in the case at bench is *not* one of jury misconduct and, hence, that the presumption of prejudice to defendant does not arise. It is the People's contention that since the jury had possession of the police report face sheet in *open* court while the jury was in the jury box, it is simply a case of inadmissible evidence being received during the trial with no presumption of prejudice in favor of the defendant. It is the position of the People that the presumption of prejudice to a defendant which arises from jury misconduct or from the jury's receipt of material not admitted into evidence, is limited to situations in which the jury receives information at a time other than during the presentation of evidence at the trial. For this view of the law, the People rely upon the following statement contained in *People v. Martinez* (1978) 82 Cal.App.3d 1, 21 [147 Cal.Rptr. 208]: "It is well settled that evidence obtained by jurors from sources *other than in court* is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby." (Italics added.)

We must reject the People's position as constituting a misreading of *Martinez*. It is true that, in the *Martinez* case, there was juror misconduct which involved the conduct of the jury foreman in bringing maps into the jury room—maps which had not been received into evidence. It does appear that most of the cases involving true jury misconduct, or the jury's receipt of inadmissible material or information not introduced into evidence which ought not to be given a label of jury misconduct unless true juror misconduct is involved, have involved situations in which the jury has obtained information or material at a time other than while evidence was being introduced. Thus, in *Honeycutt,* a jury foreman sought advice from an attorney after court had adjourned, a case of true juror misconduct. In *Kitt,* photographs not introduced at trial were inadvertently sent into the jury room at the start of deliberations—not a case of true jury misconduct, and in *People v. Conkling* (1896) 111 Cal. 616 [44 P. 314], out-of-court experiments were conducted by two jurors, a case of true juror misconduct.

But none of these cases can be cited for the proposition that either jury misconduct, or the jury's receipt of inadmissible material or information not introduced into evidence, both of which create a presumption of prejudice against a criminal defendant, results in such a presumption only when the jury misconduct or the jury's inadvertent receipt of inadmissible information occurs at a time other than during the introduction of evidence at the trial. If the document in issue in the instant case had been offered into evidence and defendant's objection thereto had

been overruled, we would then be faced with error because of the trial judge's ruling—not because of the jury's inadvertent receipt of the document. But here the jury was inadvertently given access to an inadmissible and obviously prejudicial document while evidence was being introduced. This is not, therefore, a case of judicial error.

■ We hold that the time at which a jury obtains possession of an inadmissible document or other information not introduced into evidence, is irrelevant to a consideration of whether prejudicial error involving the jury has occurred. It is the *inadvertent* receipt by the jury of inadmissible evidence that constitutes the kind of error involving the jury which creates the presumption of prejudice to defendant, irrespective of whether the receipt of such evidence occurs during the introduction of evidence or while the court is not in session. We interpret the statement found in *Martinez* to mean simply that an error involving the jury— which has the same effect as true jury misconduct—occurs when evidence is obtained by jurors from sources other than a trial court's ruling admitting proffered evidence.

We conclude, therefore, that the jury's inadvertent possession of the police report face sheet, although not jury misconduct, amounted to an error involving the jury, which created a presumption of prejudice to defendant, a presumption which, unless rebutted, would require a reversal of defendant's conviction.

B. ■ *Was the Presumption of Prejudice Arising From the Jury's Possession of an Inadmissible Document Rebutted?*

■ Once there is a presumption of prejudice which arises from juror misconduct, or from the jury's receipt of inadmissible material or information not introduced into evidence, the burden is upon the prosecution to rebut that presumption. As stated in *Honeycutt, supra,* 20 Cal.3d 150, 156: "[T]he presumption may be rebutted by proof that no prejudice actually resulted."

■ The reference to defendant as a suspect in a second murder, found in the police report face sheet that was attached to the transcript of defendant's statements, had already been brought before the jury prior to the playing of the tape recording of defendant's statements. Officer McAvay, in testifying about defendant's statements, was asked to relate his conversation with defendant with respect to the instant case. In answer to this appropriate question, Officer McAvay stated that he

advised defendant that "he knew about the murders of both old women." At first, defense counsel made a motion for a mistrial because of this testimony. Thereafter, he withdrew the motion for a mistrial and entered into a stipulation for an explanation and admonition to the jury.

The stipulation announced by the prosecutor in the jury's presence was as follows: "If it please the Court, in view of the fact that Officer McAvay testified that the defendant said he heard about the two murders of the two old ladies, People and defense are now entering into the following stipulation. May it be stipulated hereby that the homicide involving Vernita Curtis was publicized in the Long Beach newspapers and was common knowledge in the Long Beach community; that, in addition to the Curtis homicide, there was also publicized in the Long Beach newspapers another homicide regarding another elderly woman, and this was also common knowledge in the Long Beach community at that time; that there is no evidence to connect the Defendant Boyd with the second mentioned homicide and, as a matter of fact, the evidence collected by the Long Beach Police Department indicates that Defendant Boyd was not implicated in any way with the second mentioned homicide; further, police investigation uncovered evidence that three males, none Defendant Boyd, were connected with the second mentioned homicide and were so charged. [¶] . . . Further stipulated that the jury should draw no inference from the statement made by Officer McAvay that Defendant Boyd was in any way connected with this other mentioned homicide; further stipulated that Officer McAvay mentioned this other homicide only because his department was investigating all homicides which had been committed in Long Beach up to that time, and that was the only reason he mentioned the other homicide to Defendant Boyd; that Defendant Boyd's response that he knew about the other—[¶] . . .—about the other homicide was because he had read it in the newspapers and it was common knowledge in the community at that time. . . ."

On May 23, 1978, at the hearing on defendant's motion for a new trial, the prosecutor and defense counsel entered into a written stipulation which reads as follows: "1. When the jury was handed copies of the transcript during that phase of the trial when the tape recorded statement of the defendant was played a face page was included with some of the transcripts. Neither Robert Aitken [defense counsel] nor Paul Marin [deputy district attorney] had knowledge or were consciously aware that the face page included the name of an additional murder victim and an additional accused besides the defendant and co-defendant Jackson, to

wit, an Anthony Smith and Stanley Wells. A copy of that face page is attached as Exhibit 'A' and incorporated by reference herein. That face page includes the names of two victims (Curtis, Vernita J. and Ott, Gladys A.) and the names of four accused (Jackson, Boyd, Wells and Smith). [¶] 2. The jurors returned the copies of the transcripts and face pages after the tape recorded statement of defendant Boyd was played to them. None of the transcripts or face pages were introduced as exhibits at that time. [¶] 3. The court read an extended stipulation to the jury that defendant Boyd had no alleged involvement in any other homicide other than the one charged. A copy of this stipulation is attached as Exhibit 'B' and incorporated by reference herein. [¶] 4. After the jurors returned to deliberate they called and asked to either hear the recorded statement of the defendant played again or receive a copy of the transcript of that statement. [¶] 5. The court permitted the case to be reopened for this limited purpose. Counsel for defendant and the prosecution then stipulated that the jury could receive a copy of the transcript. Accordingly, a copy of the transcript was admitted as an exhibit and given to the jury. This exhibit did not contain the face page which is Exhibit 'A.' [¶] 6. After the verdict was entered, juror Merly [sic] Wood said that after the jury had arrived at a verdict in the jury room and while awaiting call to return to the courtroom there was some discussion by the jurors speculating if defendant Boyd was involved in anything else. Such speculation was raised by one or more jurors during general social discussions among the jurors. Juror Meryl [sic] Wood further said that none of the information on the face page was ever discussed by any of the jurors and that it did not enter into their deliberations in any way."[4]

Had defendant not withdrawn his motion for a mistrial because of the prejudicial police report face sheet which was inadvertently seen by the jury, and had the trial judge not granted such motion, defendant would have been in a much better position before us in urging a reversal of the judgment on the ground of prejudicial error. Having withdrawn his motion for a mistrial and having entered into a stipulation of admonishment to the jury to disregard the prejudicial document, we cannot endorse defendant's position of taking a chance for a favorable verdict from the jury and then, upon not receiving such a verdict, urge on appeal prejudicial error from the jury's receipt of an inadmissible document not

---

[4]In view of the fact that we have set forth previously herein the substance of the police report face sheet, which the jury had in its possession, and the stipulation with reference to Officer McAvay's testimony, we find it unnecessary to set forth the copies, which are attached as exhibits A and B respectively to the May 23 stipulation.

introduced into evidence—an error which might well have been averted had defendant insisted upon his motion for a mistrial.

In light of the first stipulation that was entered into for admonishment to the jury and the subsequent stipulation which set forth a statement from juror Merle Wood regarding a discussion between jurors after a verdict had been arrived at, we conclude that the presumption of prejudice was rebutted "by proof that no prejudice actually resulted." (*Honeycutt, supra,* 20 Cal.3d 150, 156.)

## IV

### *The Two Color Photographs of the Victim*

■ Defendant asserts that, by reason of Evidence Code section 352, it was error for the trial court to admit two color photographs of the victim over defendant's objection that any probative value of such photographs was clearly outweighed by the danger of manifest prejudice to defendant. We have examined these two photographs which picture black and blue areas on and about the victim's face, including the mouth, eyes and neck. These photographs certainly reflect that the victim received a severe beating. But we do not view these photographs as particularly gruesome or inflammatory. Nevertheless, they presented a danger of prejudice to defendant by reason of their reflection of a severe beating to an elderly female.

Pursuant to the weighing process required by Evidence Code section 352, the trial judge had to determine the probative value of such photographs, contrasted with the danger of undue prejudice to defendant from admissibility. We find little probative value in these photographs. The prosecution's theory of first degree murder against defendant rested on the felony-murder rule—a killing occurring during the perpetration of a felony—here, burglary. It cannot be said, therefore, that the photographs had any degree of relevancy on issues such as intent, malice or the degree of the offense since, under the prosecution's theory, defendant was guilty of first degree murder by virtue of the felony-murder doctrine.

The People argue that the two color photographs of the victim were relevant on the issue of whether the victim died from the beating inflicted by codefendant Jackson while defendant was inside the apartment with him, or from a later beating administered by Jackson alone. This argument is unpersuasive. The deputy medical examiner who performed the autopsy testified that the victim's death was due to multiple injuries resulting from blunt force trauma of the head and neck area, and that the

force could have been the result of blows from the hand. The physician on duty in the emergency room of the hospital where the victim was taken testified that the injuries which he observed appeared to have been caused within a period of 24 hours of his observations.

Thus, the two color photographs could shed no light on whether the victim was beaten simply on one occasion, or on two occasions occurring within a few minutes or hours of each other. The evidence, without the photographs, established that defendant was beaten to death. The photographs were not needed to clarify or explain in any way the testimony of the physician at the hospital who observed the victim before her death or the testimony of the deputy medical examiner who performed the autopsy. The trial court thus erred in admitting the two color photographs since they had little probative value as contrasted with a substantial danger of prejudice to defendant. (*People* v. *Smith* (1973) 33 Cal.App.3d 51 [108 Cal.Rptr. 698]; cf. *People* v. *Jentry* (1977) 69 Cal.App.3d 615 [138 Cal.Rptr. 250].)

The question presented, therefore, is whether this error was so prejudicial as to mandate a reversal of the judgment of conviction. In determining this question, we examine the entire record. The evidence of defendant's guilt borders on being overwhelming in nature. In addition, the testimony of the victim's granddaughter described the victim's beaten appearance as graphically as that demonstrated by the two color photographs. Under these circumstances we find it extremely unlikely that the photographs could have inflamed the jury so that it would have arrived at a verdict against defendant which would not have been arrived at in the absence of the receipt into evidence of these two color photographs. It is certainly not reasonably probable that a result more favorable to defendant would have been reached at trial had the two color photographs been excluded. (*People* v. *Duran* (1976) 16 Cal.3d 282, 296 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

V

*The Question of Whether Defendant Is*
*Entitled to 124 Days of Work Time and*
*Good Time Credit on His Prison Term*
*for the Days Spent in*
*Presentence Custody*

■ Defendant advances the contention that, pursuant to Penal Code section 2900.5, he is entitled to credit on his term of imprisonment—not

only for the number of days (248) actually spent in presentence custody which was awarded to him by the trial judge—but also days for the "work time" and "good time" earned during his presentence custody. Defendant relies upon Penal Code section 2900.5, subdivision (a), which provides for credit for presentence custody time, "including days credited to the period of confinement pursuant to Section 4019 [of the Penal Code]."

The question presented is that of the proper interpretation of Penal Code sections 4019 and 2900.5. Pursuant to Penal Code section 4019, subdivisions (b) and (c), a defendant, coming within the provisions of subdivision (a), is entitled to separate credits of one day for "work time" and one day for "good time" for each six-day period spent in custody. We turn, therefore, to the provisions of Penal Code section 4019, subdivision (a)(1). Under these provisions, the work-time and good-time credits become available "[w]hen a prisoner is confined in or committed to a county jail, industrial farm, or road camp, or any city jail, industrial farm, or road camp, including all days of custody from the date of arrest to the date on which the serving of the sentence commences, *under a judgment of imprisonment*, or a fine and imprisonment until the fine is paid in a criminal action or proceeding." (Pen. Code, § 4019, subd. (a)(1).) (Italics added.)

The language of subdivision (a)(1) of section 4019 makes it clear and specific that the good-time and work-time credits provided by subdivisions (b) and (c) are applicable only to a defendant who is under "a judgment of imprisonment" in a county jail or other nonprison facility set forth in subdivision (a)(1). This applies, therefore, only to a misdemeanor judgment.

We do not believe that the language of Penal Code section 4019, subdivision (a)(1), can be logically interpreted to cover a defendant who is sentenced to prison. It is to be noted that Penal Code section 2900.5 applies to both felony and misdemeanor convictions. But in using the language of "including days credited to the period of confinement pursuant to Section 4019," that part of Penal Code section 2900.5 can only have reference to misdemeanor convictions and sentences to a county jail or similar facility, since such convictions and sentences are the

only ones receiving good-time and work-time credits under Penal Code section 4019.[5]

The judgment is affirmed.

Kingsley, Acting P. J., and Alarcon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 11, 1979.

---

[5]We are aware of the fact that several Court of Appeal decisions have made differing interpretations of Penal Code sections 2900.5 and 4019. The California Supreme Court granted hearings in these cases on May 30, 1979. (See *People* v. *Sage* (Crim. 20997)*; *People* v. *Brown* (Crim. 20998)*; and *In re Davis* (Crim. 20999).*) (See also *People* v. *Galloway* (1979) 94 Cal.App.3d 590 [156 Cal.Rptr. 547].)

*Reporter's Note: For Supreme Court opinion in *People* v. *Sage* see 26 Cal.3d 498. On June 18, 1980, *People* v. *Brown* and *In re Davis* were retransferred to the Court of Appeal for reconsideration in light of *People* v. *Sage*.