[Crim. No. 34850. Second Dist., Div. Four. Dec. 13, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN MANUEL LOPEZ, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Harold E. Shabo and Robert Scarlett, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JEFFERSON (Bernard), J.**—By information defendant was charged with the murder of Antonio Magallon in violation of Penal Code section 187. It was also alleged that defendant had used a firearm during the commission of the offense in violation of Penal Code section 1203.06, subdivision (a)(1).

Defendant entered a plea of not guilty and denied the firearm use allegation. Defendant personally and all counsel waived the right to trial by jury. Trial was by the court. Defendant was found guilty of murder in the second degree. The court found to be true the allegation that defendant had used a firearm during the commission of the offense. Probation was denied, and defendant was sentenced to state prison for the term prescribed by law. Defendant appeals from the judgment of conviction.

I

*The Factual Background*

On November 19, 1976, the Los Angeles Police Department received a report that shots were being fired at the address—1242 Wilmington Boulevard in Wilmington. Officer Ibarra went to the location at 10 p.m. and discovered three .22 caliber expended cartridges in the street in front of the Wilmington address. Ibarra spoke to defendant and advised him of the constitutional rights. Defendant waived his rights and admitted shooting the .22 semiautomatic Glenfield model 60 rifle. The police took possession of the weapon, but, on December 21, 1976, it was released to Regina Lopez, wife of the defendant.

On Saturday night April 1, 1977, near midnight, Audrey Hart, the manager of the Holland Hotel at 126 West D Street in Wilmington, noticed that a disturbance was taking place in front of the residence next to the hotel, at 122 West D Street. She called Jim Wise to the scene; Wise, the owner of both the hotel and the residence next to it, had been working on one of the floors of the hotel.

Wise left the hotel and approached three individuals arguing in Spanish; he noted that one individual involved was Antonio Magallon, his tenant at 122 West D Street, and that Magallon had been drinking. He appeared very angry, and was trading insults with two males standing next to a vehicle parked in the street. Wise attempted to calm Magallon down; Magallon started toward his residence, but another remark from one of the two men brought him back to the car, which he kicked. One of the men got into the car, but the other took a rifle out of the car.

Rudy Marquez, defendant's half brother, testified at trial that he and his girlfriend, Anita Hernandez, had been driving in the area of Avalon and D Street when they saw defendant engaged in argument with Magallon. Rudy approached the two with the intention of getting defendant away from the scene; he observed that defendant was intoxicated, although not extremely so. According to Rudy Marquez, as Magallon headed for his residence, defendant took a rifle from the car, stating that he was "going to scare the guy a little." Defendant commenced firing the rifle. Six to eight shots were fired.

Wise, Audrey Hart and another woman fled into the hotel when the shooting began. Down the street, a young woman, Susie De los Santos,

was sitting in a parked car with her boyfriend, and observed a red car parked on D Street with three men standing beside it. Then she heard the shooting. She watched the man holding the gun get into the car, which began moving down the street. She testified that both the driver and the passenger in the red car were Chicanos.

Antonio Magallon was married and had five children. The oldest, Gerardo, testified that on this occasion he had heard the shots and observed his father coming through the front door of 122 West D, screaming. Magallon collapsed in the front hallway and died.

After the shooting, defendant parked his automobile nearby and went home with Rudy Marquez and Anita Hernandez; Marquez and defendant returned later that evening, after the police had left the area, and defendant regained possession of his automobile; apparently the rifle had remained on the back seat of defendant's vehicle.

Wise called the police after the shots were fired; they arrived quickly. Los Angeles Police Officer Woodrum found eight .22 caliber shell casings in the street and placed them in an envelope.

None of the witnesses at the scene of the crime could provide much in the way of identification, although the police report filed on the incident mentioned the color of the automobile.

On April 2, 1977, Rudy Marquez spoke of the incident to Anita Hernandez, telling her that he had seen the defendant shoot Magallon, and that defendant sometimes got carried away and liked to fire his rifle. He gave Anita some bullets, and told her to dispose of them. A half-sister of defendant, Julie Larios, overheard defendant telling his mother he had shot a man, and was going to Texas because the police were looking for him; Julie also discussed the matter with Anita Hernandez, who told her she had seen defendant take the gun out of his car.

An autopsy conducted on Magallon's body revealed that Magallon had been shot six times, the fatal shot having perforated his lung and heart from the back. Fragments of bullets were removed from the body and preserved as evidence. A ballistics expert, Baggett, examined the bullet fragments; while he could not determine that the bullets had been fired from a particular weapon, he did conclude, from the unique grooves on the fragments, that the bullets had been fired by a Marlin

Glenfield weapon, and that the fragments were consistent with those that would be fired from a .22 long rifle. The markings were also consistent with a Glenfield model 60 .22 caliber rifle.

Shortly after the shooting, defendant left for Texas; while there he visited an older married half-sister, Yolanda. He also encountered another half-brother, Los Angeles Police Officer Catarino Marquez, known as Marc, who happened to be taking a spring vacation, and had stopped to see Yolanda. Defendant was evasive, but Officer Marquez had no reason to suspect defendant of any crime at that time.

The major Marquez residence was that of the mother, Maria, at 1242 Wilmington Boulevard. It was apparently sometimes the home of Rudy Marquez and defendant, and all the other family members visited frequently, including Officer Marquez, who lived elsewhere. When Officer Marquez returned from Texas, he heard enough family gossip to entertain the suspicion that defendant had been involved in a shooting incident. Officer Marquez acquainted himself with the details contained in police reports of criminal activity that had recently taken place. He noted that the general description of the suspect in the Magallon murder fitted that of his half-brother, the defendant, and that the car was similar to the vehicle he had sold his half-brother, the defendant, some time previously.

While not assigned officially to the case until April 1978, Officer Marquez attempted to gather information about the Magallon murder during the early months of 1978, although various family members and an Elaine Abercrombie, a girlfriend of defendant, attempted to dissuade him from his task. In February 1978, Officer Marquez got a statement from Anita Hernandez implicating defendant in the Magallon murder; and on April 24, 1978, Officer Marquez arrested Rudy Marquez, his brother, and got a statement from him which was tape recorded.

Defendant had, by this time, returned from Texas. However, when he learned that his arrest was imminent, he commenced making plans to again leave the state. Officer Marquez, now officially assigned to the case, went to the 1242 Wilmington address on the evening of April 24, 1978, to arrest defendant. There he learned of defendant's efforts to raise money in order to effectuate his escape. Someone there advised Officer Marquez that defendant was at the Comet Motel, about two blocks away, waiting for money to be delivered to him; this information

was given Officer Marquez 20 minutes before the actual arrest took place.

Early in the morning of April 25, 1978, Officer Marquez and some other police officers went to the Comet Motel in Wilmington and located defendant there, registered as Juan Valencia. Marquez knocked on defendant's door several times without getting a response. He stated that he was a police officer and was there to arrest defendant. Defendant opened the door, and was standing at the doorway when Marquez advised him he was under arrest for murder. Officer Marquez had not obtained an arrest warrant.

Defendant was transported to the Harbor Police Station. He kept asking Officer Marquez the details of the charge against him. Marquez replied that he did not want to talk to defendant unless defendant was willing to make a statement. At the station, defendant was advised by Marquez of his constitutional rights, including the right to remain silent. Defendant was asked if he wished to give up the right to remain silent, to which he replied: "No." At that point, Officer Marquez indicated that the interrogation was at an end. Defendant was concerned, however, about his half-brother, Rudy Marquez. He asked Officer Marquez if Rudy was in custody, and was told he was. He asked again about the evidence against him, and was told that Rudy had made a statement implicating him. Defendant asked to read the statement, but was told he could not. Defendant was told there was a tape recording of Rudy's statement, and he asked if he could hear it.

Officer Marquez decided to let defendant hear the tape recording. No further questions had been asked defendant by any officer at this stage of the proceedings, and the tape recording was then played. After the tape was played, defendant stated: "I shot that guy. My brother didn't have anything to do with it, and I shot the dude."

Defendant testified on his own behalf. He admitted that he was at the scene of the crime and that he had had a dispute with the victim. He also testified that he had been drinking all day. However, he stated that the shooting of Magallon had been by some other individuals present whom he would not identify for fear of reprisal.

On this appeal, defendant makes three contentions concerning the case.

## II

### *The Confession*

A. *Was Defendant's Confession, Made After Miranda Warnings, a Violation of Miranda Nevertheless?*

At trial, defendant moved to suppress the extrajudicial statement made by him admitting the shooting, on the ground that it was obtained in violation of his privilege against self-incrimination. A hearing was held, and the trial court ruled that defendant's statement to the police had not been obtained in violation of his constitutional rights, had been voluntary, and was therefore admissible. Defendant contends that the trial court's ruling was erroneous, and constituted reversible error.

The constitutional rights relied upon by defendant are those which were set forth in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], concerning interrogation of a suspect in the custody of the police. Pertinent to the case at bench is the *Miranda* principle that "[o]nce warnings have been given, the subsequent procedure is clear. ■ If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Id.* at pp. 473-474 [16 L.Ed.2d at p. 723].) Statements obtained by the police in violation of this principle are inadmissible against the individual in a subsequent trial. This has long been the law of California (*People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]) and remains viable today as part of that panoply of rights guaranteed to the citizens of California by the California Constitution. (*People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]; see Cal. Const., art. I, § 24.)

California case law has recognized, however, as did *Miranda*, that the police were not precluded from testifying to statements volunteered to them by a suspect, statements made—not as the result of police coercion—but as an exercise of free will. (See *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) And, "[s]tatements volunteered when not in response to an interrogation are admissible against a defendant, *even after an initial assertion of the right to remain silent.* [Citations.] The issue is thus whether the statement was volunteered or was the product of police interrogation."

(*People* v. *McDaniel* (1976) 16 Cal.3d 156, 172 [127 Cal.Rptr. 467, 545 P.2d 843].) (Italics added.) ■ When a suspect has elected to be silent, but at some later time volunteers statements or reinitiates conversation with the police, the trial court, in ruling upon the admissibility of the subsequent statements, weighs the evidence relevant to the attendant circumstances, particularly that demonstrating the presence of or absence of coercion.

■ Defendant specifically contends that the conduct of the police in playing the tape recording of the Rudy Marquez statement, after defendant had indicated his desire to remain silent, constituted the unlawful resumption of interrogation by the police. Defendant denied that he had requested the police to play the tape, but Officer Marquez testified that, beginning shortly after his arrest, defendant asked a number of questions seeking information about the murder charge, and specifically requested the playing of the tape. The conflict in the evidence was resolved in the People's favor, and, since there was substantial evidence in support of the resolution, we must accept it. (*People* v. *McDaniel, supra,* 16 Cal.3d 156, at p. 172.)

It follows that, since defendant requested that the tape be played, it was the defendant who prolonged the interrogation at a time when the police officers had terminated the interview and were preparing to book the defendant. No further questioning of the defendant was undertaken. It is unmistakably clear that defendant's statement, made after the tape was played, was not coerced under these circumstances. Hence, it was admissible against him. We find no violation of defendant's constitutional rights.

> B. *Was the Custodial Interrogation Conducted*
> *by the Brother of Defendant Inherently*
> *Coercive Because of the Family Relationship?*

■ Defendant further contends that his confession should not have been admitted into evidence because "any custodial interrogation conducted by a close family relation is inherently coercive." In the case at bench, it was conducted by defendant's half-brother, Officer Marquez. At the outset, we point out that no evidence was adduced below with respect to Officer Marquez' approach to obtaining the tape-recorded statement from his brother Rudy, the statement which led to defendant's confession. The inquiry below was directed toward the

circumstances attendant upon defendant's interrogation. Defendant cites no authority for the premise that every interrogation of a suspect by a relative must of necessity contain elements of coercion. Defendant relies upon such cases as *Spano* v. *New York* (1959) 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202], wherein the defendant was interrogated for many hours by an "old family friend" along with the police. Defendant also finds the situation analogous to such police interrogation techniques as one officer appearing to be sympathetic with the defendant while another portrays the brutal authority figure.

■ There can be no quarrel with the principle of law that a confession coerced by either physical or psychological means is not a voluntary confession and, hence, is inadmissible evidence. To admit such a confession into evidence constitutes reversible error *per se*. (*People* v. *McClary* (1977) 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620].) As *McClary* tells us, the courts have an independent duty to review the evidence concerning such claimed coercion.

■ In assessing the circumstances presented here, we note that defendant apparently did not feel sufficiently coerced by the presence of his half-brother to waive his constitutional right to remain silent in the first instance. Nor does the record provide any evidence—credible or otherwise—that Police Officer Marquez used his relationship with the defendant to elicit incriminating statements from him. While there might, in a given case, be circumstances involved in the family relationship from which coercion could be inferred, we find nothing here which suggests that such was the case. There is no showing of any threats or inducements or any expression, even by defendant, that the presence of his half-brother produced his confession. Therefore, this contention of defendant must fail.

### III

*Was Defendants' Confession Inadmissible as the Product of an Illegal Arrest Even If Miranda Warnings Were Given?*

■ During trial, defense counsel moved to exclude defendant's confession to the police on the ground that it resulted from the warrantless—and thus unlawful—arrest of defendant at the Comet Motel. The trial court ruled that there had been no violation of defendant's constitutional right to be free of unreasonable search and seizure, and

admitted the confession. Defendant contends here that the ruling was erroneous and that his conviction should be reversed.

Defendant relies in part upon *Dunaway v. New York* (1979) 442 U.S. 200 [60 L.Ed.2d 824, 99 S.Ct. 2248], which held that, although a confession after proper *Miranda* warnings may be found to be "voluntary"for purposes of a defendant's rights against self-incrimination under the Fifth Amendment to the United States Constitution, such a confession must be held to be inadmissible if obtained by exploitation of an illegal arrest. The *Dunaway* court points out that *Brown v. Illinois* (1975) 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254], identified several factors to be considered in determining whether a confession, obtained after an illegal arrest of defendant, was obtained by exploitation of the illegal arrest. These factors are (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the official misconduct; and (4) the burden of proof—the burden of showing admissibility resting on the prosecution.

The *Dunaway* and *Brown* principle can have application in the case before us only if defendant's warrantless arrest was illegal. Defendant argues that his arrest was illegal in light of the rule set forth in *People v. Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333], with its holding that a warrantless arrest within a residence constitutes such a serious intrusion into the privacy of the home that it is unreasonable per se and constitutionally invalid in the absence of (1) exigent circumstances, or (2) consent to the entry.

The circumstances delineated as "exigent" in *Ramey* were those emergent situations "requiring swift action to prevent imminent danger to life or serious damage to property, or *to forestall the imminent escape of a suspect* or destruction of evidence." (16 Cal.3d at p. 276; italics added.) As *Ramey* explained, "[t]here is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ibid.*)

There is no doubt that these principles have application to the case at bench. Since *Ramey*, the California Supreme Court has made it clear that an intrusion into a rented hotel or motel room without a warrant constitutes conduct as unconstitutional as that prohibited by *Ramey*. (*People v. Escudero* (1979) 23 Cal.3d 800, 807 [153 Cal.Rptr. 825, 592 P.2d 312].)

In essence, the claim of emergency justifying the failure to obtain an arrest warrant in the case before us rested upon the conclusion of Officer Marquez that the defendant was about to flee the state. The specific and articulable facts known to Officer Marquez provide the yardstick for assessing the claim of emergency. Marquez testified that he first planned to arrest defendant at his mother's home, where defendant had been staying; when he arrived there, he learned from family members that defendant was trying to raise money for flight. He was told that defendant was staying at the Comet Motel two blocks away, awaiting funds. When Officer Marquez arrived at the motel, he learned that defendant was registered there under an assumed name.

Of considerable importance, we think, is the fact that Officer Marquez knew that the defendant had fled once before, after the commission of the offense, and that there were relatives in Texas who would very likely provide a refuge for defendant. We conclude that there was substantial evidence supporting the trial court's ruling that the arrest was lawful, and came within the exception set forth in *Ramey* that a warrantless arrest in the home is justified "to forestall the imminent escape of a suspect."

Defendant argues that the record clearly demonstrated that Officer Marquez planned to make an illegal arrest of defendant at his mother's home, had he found defendant there, and that the subsequent "emergency," if it existed, occasioned by defendant's retreat to the Comet Motel, should be deemed irrelevant in ascertaining the legality of the motel arrest. We may not speculate, however, on what did not in fact occur; it is equally reasonable to assume that Officer Marquez was planning to obtain entry into the Marquez home through a "consent" from the mother as the occupant of the premises.

## IV

### *The Sentence*

Defendant also contends that he was entitled to credit on his term of imprisonment—not only for the number of days actually spent in presentence custody which was awarded him by the trial judge (218)—but also for the "work" and "good time" days earned during his presentence custody. Defendant relies upon Penal Code section 2900.5, subdivision (a), which provides for presentence custody time, "including

days credited to the period of confinement pursuant to Section 4019" of the Penal Code.

Penal Code section 4019, subdivision (a)(1), provides that the work-time and good-time credits become available "[w]hen a prisoner is confined in or committed to a county jail, industrial farm, or road camp, or any city jail, industrial farm, or road camp, including all days of custody from the date of arrest to the date on which the serving of the sentence commences, under a judgment of imprisonment, or a fine and imprisonment until the fine is paid in a criminal action or proceeding."

In *People* v. *Boyd* (1979) 95 Cal.App.3d 577, 590 [157 Cal.Rptr. 293], a similar contention was made by the defendant and was rejected by the court, on the ground that Penal Code section 4019, subdivision (a)(1), cannot be "logically interpreted to cover a defendant who is sentenced to prison." (*Id.* at p. 591.)

There is a section of the Penal Code which is applicable to inmates of state prisons. It is Penal Code section 2931, which became effective July 1, 1977, and which provides, in pertinent part, that "(a) In any case in which an inmate was sentenced to the state prison pursuant to Section 1170, or if he committed a felony before July 1, 1977, and he would have been sentenced under Section 1170 if the felony had been committed after July 1, 1977, the Department of Corrections shall have the authority to reduce the term prescribed under such section by one-third for good behavior and participation consistent with subdivision (d) of Section 1170.2 . . . ."

The proper interpretation of Penal Code sections 4019 and 2931, and any equal protection problems arising from the application of these sections, are currently being considered by the California Supreme Court in *People* v. *Sage* (Crim. 20997); *People* v. *Brown* (Crim. 20998) and *In re Davis* (Crim. 20999). (See also *People* v. *Galloway* ■ (Cal.App.).)

We view the reasoning of *Boyd* as correct; it follows, therefore, that defendant's entitlement to reduction of sentence for "work" and "good time," whether presentence or while in state prison, will properly be the concern of the Department of Corrections, determined by them in accordance with the procedures approved by the Supreme Court. Should

defendant find fault with the mathematical computation of the department, relative to the time he is to serve, he can then avail himself of the appropriate remedy for contesting the computation, on constitutional or other grounds.

The judgment is affirmed.

Kingsley, Acting P. J., and Swearinger, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 20, 1980.

---

*Assigned by the Chairperson of the Judicial Council.