[Crim. No. 35969. Second Dist., Div. Two. Oct. 6, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES DICK HILL, JR., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and F. Elaine Easley, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BEACH, J.—A jury found appellant guilty of rape (Pen. Code, § 261, subds. 2 and 3), assault with a deadly weapon (Pen. Code, § 245, subd. (a)), sodomy by force (Pen. Code, § 286, subd. (c)), and robbery (Pen. Code, § 211). The trial court denied appellant's motion for a new trial and sentenced him to state prison. Appellant appeals, claiming prejudice as a result of (1) the jury's receipt of inadmissible evidence and (2) improper cross-examination by the prosecutor. We affirm.

FACTS:

1. *The December 30, 1978, Incident*

At 4 a.m. on December 30, 1978, shortly after getting off work, Melanee W. (an 18-year-old woman) drove to the back of her apartment in Long Beach and parked her car. When she opened the car door, she was hit in the face with a fist. This was repeated four more times. Melanee hit and kicked her assailant, a young black male who was wearing knitted gloves. After putting a coat over Melanee's face to smother her screams, the assailant entered the car, pulled Melanee's legs up, and hit her. Melanee blacked out. When she regained consciousness, she found herself in the backseat without any clothes on. Her assailant placed his penis into her vagina but was unable to keep it there, causing him to become angry. Melanee then suggested that she would do anything once they were out of the car. Her assailant agreed. As she got out of the car, Melanee got hold of a tire iron which she hid under a coat she was carrying. When her assailant grabbed Melanee by the hair, she hit him with the tire iron but he took the tire iron away from her and, saying he would kill her, hit her in the face with it. At

that moment a car approached and the assailant ran off. Melanee went to her apartment and had a neighbor call the police, who subsequently took her to the hospital. There Melanee received eight stitches across her lip. Several days later, on January 3, 1979, Officer George Fox of the Long Beach Police Department showed Melanee 200 photographs for identification. She did not select any. However, on February 26, 1979, when the police showed Melanee six photographs, she pointed to appellant's photograph, saying, "This one here is the closest." In court she identified appellant as her assailant.

2. *The February 20, 1979, Incident*

Between 3:30 and 4 a.m. on February 20, 1979, as Jennifer G. (an 18-year-old woman) was getting out of her car, which was parked in front of her well-lighted apartment building in Long Beach, appellant placed his hands, which were covered by knitted gloves, over her mouth and shoulders, hit her in the face, grabbed her by the hair, and threw her into the back seat of the car. When Jennifer pleaded with appellant not to hurt her, he told her to shut up or he would kill her. Appellant then emptied Jennifer's wallet of the money in it ($4), unzipped his pants, and sodomized her. Following appellant's departure, Jennifer went to her apartment and called her parents, who in turn notified the police.

Jennifer, who was able to get a good look at appellant, described him as a black male, approximately 25 years old, 6 feet to 6 feet 2 inches tall, weighing 185 pounds, wearing blue or black wool gloves and a blue or black knit watch cap. The description was broadcast over the police radio and heard by Officer Paul Armour at approximately 4 a.m. The description fit appellant, whom Officer Armour knew. The officer and his partner then went to the residence of appellant's sister because Officer Armour knew that appellant often stayed there. When Officer Armour did not see appellant's car, with which he was familiar, he and his partner went to the house of appellant's parents but appellant's car was not there either.

At the hospital to which Jennifer was taken, the police showed her five photographs of males in the same age group and of similar physical description and asked if she recognized anyone. Without hesitation, Jennifer selected appellant's photograph, saying, "That's him." The next day, Officer Fox showed Jennifer some more photographs. Again she unhesitatingly selected appellant's photograph.

The following day, after being advised of his *"Miranda* rights," appellant willingly spoke to the police about the incident involving Jennifer. He stated that on the day in question he had gone to sleep at his parents' house at 10 p.m. and did not get up until 6 or 7 a.m. When Officer Fox asked appellant if he had loaned his car to someone that night, appellant replied he had not. Officer Fox then told appellant that shortly following the incident, he had driven by the house of appellant's parents but did not see appellant's car. Appellant replied that he had really spent the night at his girl friend's house but he declined to give her name.

DEFENSE:

Appellant, 34 years old at the time of trial, testified in his own behalf. At the time of the first incident involved here appellant was at his nephew's house at 2355 Lincoln in Long Beach. Alvin Parks, the nephew, testified that he and appellant went to bed at the Parks' house at about 3:20 a.m., that appellant was in a separate bedroom, and that at 11 a.m., when Parks woke up, appellant was still there.

As to the second incident, appellant testified that at that time he was with his girl friend Chris Boulenger at her house on 20th Street in Long Beach. Appellant testified that generally after work he would go either to the pool hall or to his girl friend's house. Also present at the night in question were 18-year-old Paul Trott and his 15-year-old girl friend Sikandra. Paul testified that when he went to bed at 11:30 p.m., appellant and Chris were asleep on the floor in the living room, while Sikandra was reading a book on the couch. Sikandra testified that she was reading until 3 or 4 a.m., at which time appellant was still asleep on the floor.

DISCUSSION:

1. *The Notation on Appellant's Photograph*

■ Among the items received into evidence was appellant's photograph. After the jury had returned the verdicts, defense counsel discovered that during the jury's deliberations a juror noted the following notation on the back of appellant's photograph: "3/6/78 rape/parole viol." The juror brought that to the attention of the other jurors. Appellant subsequently moved for a new trial, which was denied by the trial court.

■ A jury's inadvertent receipt of inadmissible evidence creates a presumption of prejudice which, unless rebutted, would require a reversal of a defendant's conviction. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Boyd* (1979) 95 Cal.App.3d 577, 586 [157 Cal.Rptr. 293].) In support of his motion for a new trial, appellant submitted two juror affidavits.[1] The one signed by juror Sharon Fendt stated that she was the juror who first noticed the notation in question on the back of appellant's photograph, that she brought that to the attention of the other jurors, but that she did not believe that that information "substantially or materially effected [*sic*] the verdict." The other affidavit, which defense counsel prepared for juror Linda Johnson, stated basically that she and the other jurors were aware of the information on the back of appellant's photograph. However, Mrs. Johnson refused to sign that prepared statement. Instead, in the blank space following that statement, Mrs. Johnson inserted the following handwritten statement: "I can't sign this the way it is written because I am not sure of all the facts in it. I can not swear to exactly what was on the back of the picture because I did not read it myself. After someone brought it up, everyone agreed that any prior background would not be used in the deliberations. From the beginning, everyone agreed that Hill's credibility was lacking. As I said, we only used the evidence presented during the trial. Based on this, we all found Mr. Hill guilty.

"Please do not call me again. I'm sorry that I can't sign this. Maybe you can use this instead. [signed] Linda Johnson."

■ In view of juror Johnson's statement that all of the members of the jury specifically agreed to disregard the information on the back of appellant's photograph, we conclude that any presumed prejudice was rebutted "by proof that no prejudice actually resulted." (*People* v. *Honeycutt, supra*, 20 Cal.3d 150, 156; *People* v. *Boyd, supra*, 95 Cal. App.3d 577, 589.) *People* v. *Allen* (1978) 77 Cal.App.3d 924 [144 Cal.Rptr. 6], which is relied on by appellant, is distinguishable. In *Allen*, a witness mentioned the fact that the defendant was on parole. The reviewing court, noting that it was "an extremely close case," reversed the defendant's conviction. (*Id.* at p. 935.) In contrast, here we have strong evidence of appellant's guilt. Not only was the modus operandi in each instance virtually identical, but both victims identified appel-

---

[1]The affidavits are contained in the superior court file which, upon motion of the People, we ordered to be made a part of the record on appeal.

lant, first from photographs and later in court. We agree with the trial judge in this case, who stated: "[T]his is one where the case is so strong that the matter of the writing on the back of the pictures [*sic*] really had little relevance." Here, the jury's receipt of the inadmissible evidence was not prejudicial in view of the record which points convincingly to guilt. (*People* v. *Rolon* (1967) 66 Cal.2d 690, 693 [58 Cal. Rptr. 596, 427 P.2d 196].)

### 2. *Improper Cross-Examination*

■ Appellant contends the prosecutor committed reversible error when he asked appellant on cross-examination why he had not told the police of his "set pattern" or given the police the names of his girl friend and some other friends when they questioned him about his whereabouts at the time of the February 1979 incident involving Jennifer, and instead waited until trial to provide that information. Appellant argues that the prosecutor's questions "were clearly designed to impeach appellant's credibility by creating the impression that his alibi was fabricated subsequent to his arrest" and improper under *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240].

In *Doyle*, after the defendant was given *Miranda* warnings (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), he exercised his right to remain silent. At trial, the defendant claimed that he had been "framed." On cross-examination, the prosecution sought to impeach *Doyle's* exculpatory story by asking him why he had failed to mention that earlier. In reversing *Doyle's* conviction, the United States Supreme Court pointed out that when a suspect is given *Miranda* warnings he is also given an implied assurance that the exercise of his right to remain silent will not be used to impeach an explanation given at a later time. Therefore, the high court held, as a matter of due process and of fundamental fairness the prosecutor should not be allowed to use the fact of a suspect's silence against him at trial. (*Doyle* v. *Ohio, supra,* 426 U.S. 610, 618 [49 L.Ed.2d 91, 98]; *People* v. *Barker* (1979) 94 Cal.App.3d 321, 327 [156 Cal.Rptr. 407].)

Unlike the situation in *Doyle* where following the *Miranda* warnings the defendant exercised his right to remain silent, appellant here freely talked to the police. Once a defendant is properly advised of his *Miranda* rights and chooses to make a statement, he may be fully cross-examined on it. (*People* v. *Love* (1977) 75 Cal.App.3d 928, 934 [142 Cal.Rptr. 532].) In view of the fact that following the giving of the

*Miranda* warnings, appellant freely chose to talk to the police about his whereabouts on the date and time in question. It was proper for the prosecution to ask appellant on cross-examination why he had not told the police of the "set pattern" he followed each evening or given the names of the friends with whom he had spent the night, matters asserted by appellant for the first time at trial. (*People* v. *Barker, supra,* 94 Cal.App.3d 321, 329-330; *People* v. *Love, supra,* 75 Cal.App.3d 928, 933-934; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 390 [136 Cal. Rptr. 45].)

Like *Doyle, People* v. *Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914], the other case relied on by appellant, is not applicable here. In *Galloway,* the court reversed the defendant's conviction because the prosecution had asked the defendant on cross-examination why he waited until trial to assert his alibi defense. The court held that under *Doyle* such questioning was an impermissible comment on the defendant's right to remain silent. Unlike the situation here, where appellant voluntarily chose to talk to the police, nothing in *Galloway* suggests that the defendant in that case chose to make any statement to the police. In *Galloway,* therefore, contrary to what we have in the case at bench, the prosecution's questioning did amount to an impermissible comment on the defendant's right to remain silent.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

Petitions for a rehearing were denied October 20 and October 29, 1980, and appellant's petition for a hearing by the Supreme Court was denied December 17, 1980. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.