[No. F012992. Fifth Dist. Oct. 7, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JARNAIL SINGH JASPAL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through IX.

COUNSEL

Norton Tooby, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, Edmund D. McMurray and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MARTIN, Acting P. J.**—Jarnail Singh Jaspal was charged with murder in violation of Penal Code section 187.[1] It was also alleged that appellant personally used a firearm in the commission of the offense within the meaning of section 12022.5.

A jury trial commenced on August 8, 1989. On August 24, 1989, the jury found appellant guilty of first degree murder and determined that the gun use allegation was true. Thereafter, the court heard and denied appellant's motion for new trial.

The trial court denied probation and sentenced appellant to state prison for an aggregate term of 27 years to life: 25 years to life for the violation of section 187 and a consecutive 2-year term for the firearm use enhancement. Appellant filed a timely notice of appeal.

FACTS

In February of 1985 appellant lived with four other men in an apartment located at 1514 Gage Street in Bakersfield, California. The roommates

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

included the victim, Gurmit Singh Sekon, as well as Amrik Singh Malli, Jagjit Singh Samra, and Jasbir Singh Sarai. These men were all Sikhs from the Punjab region of India.

Sarai's sister had been married to appellant for six years. Appellant acted like a big brother to Sarai and gave him advice.

On February 8, 1985, Sarai was using the only telephone in the apartment when appellant indicated he wanted to talk to Sarai and demanded he hang up the telephone. Sarai did not comply with this request. Appellant then unplugged the phone jack and Sarai threw the telephone at him. Appellant threw it back and an altercation ensued. The other roommates broke up the fight.

Sarai testified that appellant wanted to know Sarai's whereabouts the previous night. Appellant warned him that if he stayed out all night drinking and driving, the police would catch him and their family would be mad at appellant for allowing it to happen.[2] Sarai left the apartment with Sekon and they stayed in a motel room that night. Sarai testified he went to the motel for purposes of prostitution which would have been frowned upon by his family and society. Appellant unsuccessfully tried to find Sarai but returned to the apartment later that night still angry and said he was going to kill Sarai.

The following day, February 9, 1985, appellant left the apartment at noon. When he returned, he told Malli he had purchased a pistol for $200. Appellant demanded Malli bring Sarai back to the apartment to explain his behavior to appellant and said " 'When they come and talk to me and explain [to] me everything will be settled. If they don't, then I will kill both of them.[']" Appellant appeared angry and tearful.

That same day, Sarai and Sekon went to work together but Sarai stayed with a friend on Saturday night while Sekon returned to the apartment at approximately 6:30 p.m. Appellant demanded Sekon bring Sarai back to the apartment. Sekon told appellant he did not know where to find Sarai. Appellant reached under the sofa cushions and pulled out a revolver. Malli wrestled appellant from behind and grabbed the gun. Appellant became very angry. Malli threw the gun on the floor and he and appellant struggled. Appellant retrieved the gun and loaded it with bullets from a box of cartridges he had in his pocket.

After loading the revolver, he turned to Sekon and asked: " 'Should I tell you now?' " Sekon answered, " 'What are you going to tell me?' " Appellant,

---

[2]Appellant, being the elder male, was in the position of big brother to Sarai. Samra testified that in their Indian culture appellant, as the eldest, was responsible for the others.

standing next to Sekon, then shot him three times, saying, " 'Here, here, here. I told you now.' "

Malli testified that Samra had witnessed the shooting but Samra testified that he had been in the kitchen cooking and only heard the altercation. Samra testified that when he heard the three shots he then came out and saw appellant holding the gun. On cross-examination, he admitted telling Kern County Investigator William Vines that he had witnessed appellant shoot the victim.

Appellant, Malli and Samra ran out to Samra's car and were about to drive away when appellant indicated he wanted to go back for his wallet. He left his suitcase on the backseat and reentered the apartment. Samra and Malli then drove off in the vehicle, leaving appellant behind and throwing his suitcase out the window. When Malli saw the gun and a box of bullets in the car, he threw out those, too.

Malli and Samra telephoned the police reporting the murder on their way out of Bakersfield. They then drove to Los Angeles and remained there for six or seven days before returning to Bakersfield and talking to the police in person.

The police received an anonymous telephone call reporting a shooting at 1514 Gage Street, Bakersfield, on February 10, 1985. They responded to that address and found the body of Gurmit Singh Sekon on the living room floor. An autopsy revealed he had been shot three times; once each in the neck, chest and head. The gun was fired at close range to inflict the head and chest wounds. A Kmart receipt was found in a paper bag located in the living room. Investigator Vines later determined that the receipt was for the same amount that would have purchased a box of .22-caliber mini-mag cartridges. The gun was never located. A vinyl suitcase was found in an alley near the apartment. It contained three new shirts, $21.70 in change, wallets, a passport for one Mohinder Singh, and miscellaneous papers with reference to Jarnail Singh Jaspal.

After the murder, appellant left the United States and was ultimately apprehended in England in 1988. In May of 1988, extradition proceedings commenced in England and as a result, appellant was returned to the United States in April of 1989.

Appellant's brother, Baljeet Singh Mahal, testified at the extradition hearing in England that appellant had been in England since 1976 and in fact had attended a party with the witness the night of the murder. Several other

witnesses presented similar testimony to the effect that appellant was in England when the murder occurred.

## THE DEFENSE

Dalip Singh Sethi testified that in India in 1985, thousands of Sikhs were persecuted and killed in retaliation for the assassination, by Sikhs, of Indira Gandhi. As a Sikh, appellant would reasonably feel fear for his life were he deported to India. Sethi also testified that criminal suspects in India are tortured and beaten by the police if arrested. It was Sethi's testimony that appellant reasonably believed that this would happen to him if he were arrested in this case because that is what would happen to him if he were arrested in India.

Appellant testified on his own behalf and denied any involvement in the murder. He claimed he did not have an argument with Sarai or anyone on Friday, February 8, 1985. He admitted accidentally unplugging the telephone jack when Sarai was on the phone and warning Sarai against drinking and driving. He denied telling anyone on Friday that he wanted to hurt or kill anyone. He stated he went to bed at approximately 10 p.m. on Friday night.

Appellant testified he had been drinking on Saturday and went to sleep around 4 p.m. and was "dead" "drunk" and remained asleep in the bedroom until Malli woke him up by hitting his legs saying that Sekon was dead and they all had to leave before the police arrived. Appellant got up and found the victim dead on the floor but did not see any weapons. He picked up his suitcase and went to the car but when he returned for his wallet, Samra and Malli drove off and abandoned him.

Appellant went to a friend's house; he did not call the police because he did not speak English very well and he was afraid the police would beat him up and/or that he would be deported because he was an undocumented alien. The papers he had with him identified him as a Sikh and if he returned to India he feared that his life may be in danger. His friend gave him $100 and a shirt and took him to the bus stop. With the money, appellant bought a ticket to Los Angeles. He stayed there for one month and then traveled to England. About 30 days later, he learned he was accused of murder.

Sarai testified that he and appellant did not fight on Friday night, that he went to a motel to be with a prostitute. However, when Sarai talked to Investigator Vines, he was afraid that if Vines learned about the prostitute,

Sarai would be arrested and/or deported to India, where he thought his life may be in danger. Consequently, he did not tell Vines the whole truth.

Cynthia Vallejo testified she had seen and conversed with appellant twice on Saturday and he seemed to be in a good mood.

Satpal Singh testified that Sarai stayed at his apartment on Saturday night after he got off work and Sarai did not appear to be nervous, angry, or upset.

## DISCUSSION

### I. Whether the Court Erroneously Permitted the Prosecution to Introduce Evidence of, And Comment on, the Silence of the Accused After His Arrest in England

Over objection, the court permitted the prosecution, through cross-examination of appellant, to show that appellant sat silent while extradition witnesses testified falsely on his behalf.

Appellant objected to the evidence at a "side bar" conference that was not recorded and later renewed objections for the record on the grounds of relevancy and lack of foundation since there was no showing that defendant solicited the comments or testimony of the witnesses at the extradition hearing and argued that the testimony of the witnesses at the extradition hearing was irrelevant as to whether or not appellant committed a crime in this country. Appellant also objected at trial on Evidence Code section 352 grounds that the evidence would be cumulative and confusing, more prejudicial than probative.

The court twice overruled trial counsel's objections stating:

"THE COURT: Well, I've already ruled that you may go into the testimony in the other country, and I agree with the prosecution that these either are admissions by the defendant or constituted adoptive admissions and that he presented this defense to the English court.

"And to say that some other witness said it does not relieve him of the fact that it was said on his behalf. And we have to presume that when he presents a case to another court, that he is in charge of the presentation of the case that's presented on his behalf and what he presents to the other court is what he wants to have presented.

"And if a witness says something on his behalf, it's his witness that he calls that he feels to be erroneous, *he has the opportunity to correct it either*

*by testifying and correcting the misstatement or by his counsel informing the court that the statement is not a correct statement.*" (Italics added.)

Witnesses presented at the extradition hearing testified that appellant had been in England on the night the victim was murdered. This defense was in contrast to the defense appellant presented at trial, i.e., that he was indeed at the apartment at the time of the murder but that he slept through it due to his state of intoxication. The prosecutor cross-examined appellant extensively on this subject.

"[PROSECUTOR]: And isn't it a fact, sir, that in England your defense was that I was in England since 1976 and I wasn't even in California in 1985?

"[DEFENSE COUNSEL]: Objection, your Honor. There is no evidence that the defendant made any statements whatsoever. If the People want to narrow that down to something and it's not hearsay—

"THE COURT: Your objection is overruled. The answer was was it not your defense. The question was not whether this defense said anything himself. The question was was it your defense in England that you were not present here in the United States at the time of the murder but you were in fact in England?

"THE WITNESS: No, I never said that."

Cross-examination continued concerning the testimony on appellant's behalf of various people at the extradition hearing to the effect that he was in England at the time of the murder. Appellant explained on redirect examination that he knew these witnesses were giving false testimony but denied that he had asked them to do so. He claimed his brother was responsible for the false testimony and told appellant not to say anything. Appellant testified that after talking to his brother, he decided to let the witnesses go ahead and do what they wanted to do, but he refused to lie.

During his opening argument, the prosecutor said:

"Consciousness of guilt . . . . This was in court proceedings. Those witnesses were called on his behalf. Other witnesses gave false evidence for the defendant, too, and the defendant even admitted on redirect questioning by [defense counsel] yes, in fact, I knew ahead of time my brother was doing

this for me that we have people come in and lie for me and *I didn't say anything.*" (Italics added.)

In his final argument, the prosecutor further stated:

"Let's cover a few things about this defendant. He lies and he keeps on lying. Depending on the country he is in, you hear a different story. I can just hear the defense attorney over in England telling the British court after all those witnesses, your Honor, this man is innocent, and he didn't commit anything, he was in England all this time.

". . . When that defense doesn't work, gee, *I wasn't even in the states when it happened.* He is back to face trial here. We have another different defense argument shaping up.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . They are going to keep on going on this question about the British and they know what *he said over there.* Then he had to finally admit, yeah, yeah, yeah, he said they lied on his behalf.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . Now, *the defendant lied,* his friends lied for him. When it didn't work in England, his brother follows him over here and starts talking to the witnesses. . . ." (Italics added.)

■ An accused has a constitutional right to remain silent and the election to remain silent cannot be used against him. (*Miranda v. Arizona* (1966) 384 U.S. 436, 468, fn. 37 [16 L.Ed.2d 694, 720, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Any comment on, or impeachment use of, a defendant's silence after warnings on his right to remain silent is improper. (*Fletcher v. Weir* (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309]; *Doyle v. Ohio* (1976) 426 U.S. 610, 617-620 [49 L.Ed.2d 91, 97-99, 96 S.Ct. 2240].)

■ We first address whether a timely objection at trial on the ground that the prosecutor's comments constituted improper reference to appellant's right to remain silent would have cured the harm. We think not. After two sets of objections on other grounds, the trial court seemed determined to admit the evidence as an adoptive admission and the prosecution had hammered away at what had occurred at the extradition hearing to impeach appellant's credibility, claiming appellant had lied. Appellant was compelled to explain on redirect that he had not personally made the claim that he had been in England at the time of the murder. Upon this record and the apparent mind-set of the trial judge, we believe a timely objection and request for an admonition would have been futile. (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Thus, the issue was not waived.

In *Doyle* v. *Ohio, supra,* after the defendant was given *Miranda* warnings, he exercised his right to remain silent. At trial, the defendant claimed that he had been "framed." On cross-examination, the prosecution sought to impeach Doyle's exculpatory story by asking him why he had failed to mention that earlier. In reversing the conviction the Supreme Court held that as a matter of due process and of fundamental fairness the prosecutor should not be allowed to use the fact of a suspect's silence against him at trial. (*Doyle* v. *Ohio, supra,* 426 U.S. 610, 618 [49 L.Ed.2d 91, 98].)

In *People* v. *Hill* (1980) 110 Cal.App.3d 937 [168 Cal.Rptr. 272] (disapproved on other grounds in *People* v. *Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]), the defendant was properly advised of his *Miranda* rights and chose to make a statement. Defendant freely talked to the police about his whereabouts on the date and time in question. It was held proper for the prosecution to ask appellant on cross-examination why he had not told the police of the "set pattern" he followed each evening or given the names of the friends with whom he had spent the night, matters asserted by defendant for the first time at trial. The facts of *Hill* were distinguished from the case of *Doyle* v. *Ohio* on the basis that the defendant voluntarily chose to talk to the police. (See *People* v. *Poon* (1981) 125 Cal.App.3d 55, 84 [178 Cal.Rptr. 375]; see also *People* v. *Love* (1977) 75 Cal.App.3d 928, 934 [142 Cal.Rptr. 532], in which a failure to mention an alibi in a voluntary post-*Miranda* statement was held properly argued to the jury.)

 Respondent in the instant case counters that appellant should not prevail on this issue because there was no showing that appellant was "Mirandized" in England nor that he was exercising his *Miranda* right to remain silent. Respondent also argues, unpersuasively, that appellant's right to remain silent and not have that silence used against him somehow does not apply if that right is exercised in England or in some country other than the United States.

In our view, the instant case presents a different issue or a different twist than *Hill, Love,* or *Poon.* The right to remain silent at a criminal hearing is similar in nature to the right to remain silent in the face of an accusation. Unlike *Love, Hill* and *Poon,* it is not a voluntary, post-*Miranda* statement that was used against this appellant. Rather, it was appellant's silence at an extradition hearing, a proceeding criminal in nature, that was used against him and interpreted as an adoptive admission of the false testimony presented by others at the extradition hearing.

In *People* v. *Galloway* (1979) 100 Cal.3d 551 [160 Cal.Rptr. 914], the defendant was convicted of robbery. He asserted an alibi defense but the

prosecutor questioned him about his failure to mention his alibi to anyone prior to the trial and commented on that failure in his closing argument to the jury. This court reversed holding it was error for the prosecutor to question defendant about his failure to mention his alibi prior to the trial because it is fundamentally unfair to allow an arrested person's silence following constitutional warnings of his right to silence to be used to impeach an explanation subsequently offered at trial. We further held that because the evidence against defendant was not overwhelming and because the prosecutor's misconduct touched on defendant's sole defense, the error was prejudicial. (*Id.* at pp. 556-560.)

The unfairness in commenting on a defendant's silence was also noted by the court in *United States* v. *Hale* (1975) 422 U.S. 171, 180 [45 L.Ed.2d 99, 107, 95 S.Ct. 2133]:

"The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest." (Fn. omitted.)

Appellant's choice to remain silent at a proceeding, criminal in nature, also goes to the heart of our requirement that it is the prosecution's burden to prove its case and that the defendant need not testify in his own behalf and his silence is not to be used against him. We fail to see why this logic should not apply to a proceeding held in another country, when appellant's right to remain silent and not have his exercise of that right used against him was violated at the trial held in the United States.

 Respondent criticizes appellant's contentions in that they are premised on the assumption that appellant was entitled to certain protections under the United States Constitution while he was contesting extradition in England. Respondent argues that appellant failed to establish he received *Miranda* warnings prior to exercising his right to remain silent and submits appellant has failed to lay any foundation for his claim that United States constitutional rights attached to the extradition proceedings in England.[3]

---

[3]In his reply brief, appellant attaches the statement of the accused from British extradition hearing which he claims constituted the last two pages of the prosecution's exhibit 60 in the instant case. The statement of the accused indicates that appellant was cautioned at the extradition hearing that he was "not obliged to say anything unless [he] desire[d] to do so, but whatever you say will be taken down in writing, and may be given in evidence upon your trial." There were extensive arguments whether exhibit 60 would be admitted. The trial court ultimately held that it was inadmissible. At oral argument, respondent conceded this information was before the trial court.

Respondent's arguments in this respect fail to recognize or address the fundamental constitutional issue at stake here.[4] One need go no further than our Supreme Court's opinion in *Miranda* v. *Arizona, supra,* 384 U.S. 436 to know that the *Miranda* warnings promulgated in that case sprung from the court's "concern for adequate safeguards to protect precious Fifth Amendment rights . . . ." (*Id.* at p. 457 [16 L.Ed.2d at p. 713].) These principles initially gained popular acceptance in England. (*Id.* at p. 459 [16 L.Ed.2d at p. 715].) The issue is thus controlled by the Fifth Amendment which commands that no person "shall be compelled in any criminal case to be a witness against himself." British history and case law laid the foundation for our Fifth Amendment. (*Id.* at p. 461 [16 L.Ed.2d at p. 716]; *Bram* v. *United States* (1897) 168 U.S. 532, 542 [42 L.Ed. 568, 582, 18 S.Ct. 183].)

"We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values . . . . All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers* v. *State of Florida,* 309 U.S. 227, 235-238 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' (*Malloy* v. *Hogan,* 378 U.S. 1, 8 (1964)." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 460 [16 L.Ed.2d at p. 715].)

In *Bram* v. *United States, supra,* 168 U.S. 532, 549-550 [42 L.Ed. 568, 576], the Supreme Court stated:

"By statutes enacted early in the second half of the sixteenth century, . . . justices of the peace were directed on accusations of felony to 'take the examination of the said prisoner and information of them that bring him.' In 1655, the judges directed that the examination of prisoners should be without oath . . . and the reason of this rule . . . was that an examination under oath 'would be a species of duress and a violation of the maxim that no one is bound to criminate himself.' The ruling of the judges in this regard was recognized in the statute of 7 George IV, chap. 64, which although requiring

---

[4]It is well established that our Constitution protects an accused who is not a citizen of the United States. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L Ed 220, 6 S.Ct. 1064]; *Plyler* v. *Doe* (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382].)

'information of witnesses' to be 'upon oath,' simply directed an 'examination' of the accused.

"But, even where the examination was held without oath, it came to be settled by judicial decisions in England that before such an examination could be received in evidence it must appear that the accused was made to understand that it was optional with him to make a statement. *Rex* v. *Green*, 1832, 5 Car. & P. 312; *Regg* v. *Arnold*, (1838) 8 Car. &P. 621. The reason upon which this rule rested undoubtedly was, that the mere fact of the magistrate's taking the statement, even though unaccompanied with an oath, might, unless he was cautioned, operate upon the mind of the prisoner to impel him involuntarily to speak. The judicial rule as to caution was finally embodied into positive law by the statute of 11 & 12 Vict. c. 42, where, by section 18, the magistrate was directed, after having read or caused to be read to the accused the depositions against him, to ask the accused: 'Having heard the evidence, do you wish to say anything in answer to the charge? You are not obliged to say anything unless you desire to do so, but whatever you say will be taken down in writing, and may be given in evidence against you upon your trial.' "

Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in "*all settings* in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." (*Miranda* v. *Arizona*, *supra*, 384 U.S. at p. 467 [16 L.Ed.2d at p. 719], italics added.) This clearly then would apply to the instant extradition proceedings even though they were conducted in England.

*Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229], held the Fifth Amendment applicable to the states because the Fourteenth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (Fn. omitted.) *Griffin* held that the former California constitutional provision permitting a trial judge to comment on the defendant's failure to explain or deny by his testimony any evidence against him was held unconstitutional. Former California Constitution, article I, section 13, was renumbered California Constitution, article I, section 15, and the power of the trial court to so comment was deleted by a 1976 amendment to the statute.

In *People* v. *Vargas* (1973) 9 Cal.3d 470, 474 [108 Cal.Rptr. 15, 509 P.2d 959], the prosecutor commented about the lack of contradiction of a witness's testimony that she saw defendants with the victim, and added, "and there is no denial at all that they were there." Our Supreme Court held that

the comment was improper but harmless under the circumstances. While a comment that no explanation was given is acceptable, the word "denial" connotes a personal response by the accused himself. "Any witness could 'explain' the facts, but only defendant himself could 'deny' his presence at the crime scene. Accordingly, the jury could have interpreted the prosecutor's remarks as commenting upon defendant's failure to take the stand and deny his guilt." (*Id.* at p. 476.)

In *People* v. *Mendoza* (1974) 37 Cal.App.3d 717, 726 [112 Cal.Rptr. 565], our Supreme Court held that "thinly veiled" comments about the case involving lewd acts being hard to defend against implied that a failure to testify could be considered by the jury and were therefore improper.

In *People* v. *Medina* (1974) 41 Cal.App.3d 438, 457 [116 Cal.Rptr. 133], five persons—the two defendants and three alleged accomplices who were prosecution witnesses—were reported to have been at the murder scene. During final argument, the prosecutor said:

"Incidentally, you realize there were five people up there on this thing and three of them were subjected to cross-examination which is pretty sharp test of truth, and they subjected themselves to cross-examination. . . . And whatever else we say about them [alleged accomplices], that they are lying or otherwise, their testimony is unrefuted. No one has come forward and said that it is false. No one has come before you to show you it wasn't that way. You have not heard that. . . . And they were up there on that stand. They were put under oath. They were subject to perjury . . . ." It was held this was prejudicial *Griffin* error, that the prosecutor stepped over the bounds of proper comment on the defendants' failure to present a defense. (*Id.* at p. 459.) The court reasoned that the error was relatively serious and increased the likelihood that jurors indulge their natural tendency to make the inference the prosecutor urged them to make. (*Id.* at p. 463.)

█ In order for *Griffin* error to be prejudicial, the improper comment or instruction must either fill an evidentiary gap in the prosecution's case or "touch a live nerve" in the defense. (*People* v. *Vargas, supra,* 9 Cal.3d 470, 481.)

█ Here, the improper comments of the prosecutor filled not only an evidentiary gap in the prosecution's case but also "touched a live nerve" in the defense. The "gap" which the comment helped fill was the bolstering of the basically weak credibility of prosecution witnesses. (See *People* v. *Glass* (1975) 44 Cal.App.3d 772, 780 [118 Cal.Rptr. 797].) Alternatively, the evidence of appellant's silence at the extradition hearing was brought out to impeach his credibility. In other words, if appellant allowed five witnesses in

England to falsely claim that he had not been in the United States at the time of the murder, and failed to rectify those false assertions, this served as evidence that the appellant was a liar. And the prosecutor repeatedly claimed the appellant lied. If the appellant was lying, then the inference is clear that the other witnesses' version of events was more trustworthy than appellant's and the prosecution witnesses should be believed. The argument of the prosecutor clearly touched on a "live nerve" of the defense because the thrust of the prosecution's argument was that appellant presented a defense in England that was inconsistent with his defense presented at trial. The prosecutor further argued that those witnesses giving false evidence on behalf of the appellant and appellant's failure to speak up constituted a consciousness of guilt.

Therefore, and as previously stated, we reject the argument that appellant's failure to object on Fifth Amendment grounds was fatal or that a claim of violation of appellant's constitutional privilege might have triggered a recognition on the part of the trial court that this comment was improper and, thus, a timely objection and admonition would have cured the harm. (See *People* v. *Green, supra,* 27 Cal.3d 1, 34.) There was no waiver by appellant of his constitutional right against self-incrimination. The defense made several objections to the admission of this evidence on at least two separate occasions but the trial judge made clear his belief that this evidence was admissible. Furthermore, any objection during closing argument when the prosecutor made a specific reference to the fact that appellant "didn't say anything" would have been too late and futile. Because of the amount of time and energy the prosecutor spent on this subject, the number of times this matter was raised and the further fact it filled an evidentiary gap and "touched a live nerve" in the defense, we cannot say that the trial court's error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Therefore, we conclude the comments of the prosecutor constituted reversible error.

## II. *Admissibility of Testimony of Extradition Hearing Witnesses*

Appellant also complains the trial court erroneously admitted hearsay statements of the extradition witnesses as adoptive admissions of appellant. As was stated earlier, the trial court overruled defense objections, stating:

". . . I agree with the prosecution that these either are admissions by the defendant or constituted adoptive admissions and that he presented this defense to the English court."

The admissibility of adoptive admissions evidence is governed by Evidence Code section 1221 which provides that the statement of a third party is not made inadmissible by the hearsay rule if a party, with knowledge of the statement's content, manifests adoption of a belief in its truth, by words or other conduct. Appellant sets forth the elements necessary to establish an adoptive admission and makes a persuasive argument that the alleged adoptive admissions do not meet these threshold requirements. The argument is sufficiently persuasive to have convinced respondent who concedes the trial court erred in classifying this evidence as an adoptive admission. And we agree that the statements in question were neither accusatory in nature nor were the surrounding circumstances such as to require a denial by appellant. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 669-670 [408 P.2d 116].) However, the respondent submits that the testimony from witnesses at appellant's extradition hearing was properly admitted as relevant nonhearsay statements. As to this argument, we disagree.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated . . . ." (Evid. Code, § 1200.) Out-of-court statements not offered to prove the truth of the matter stated are not regarded as hearsay. Such statements are not within the hearsay rule at all. (Witkin, Cal. Evidence (2d ed. 1966) § 455, p. 418.) However, as nonhearsay statements, they must still pass the test of relevancy. ■ "The general test of relevancy of indirect evidence is whether it tends logically, naturally, and by reasonable inference to prove or disprove a material issue." (*People* v. *Jones* (1954) 42 Cal.2d 219, 222 [266 P.2d 38].)

■ Respondent argues that the statements of the witnesses at the extradition hearing were not offered at appellant's trial to prove the truth of the matter asserted. Rather, respondent argues:

"The statements were relevant to the proceedings because (1) they were made (2) in appellant's presence. . . . The statements constituting appellant's defense at the British proceedings were evidence that appellant had presented a false and untrustworthy defense to fight his extradition. The truth or falsity of the witnesses' statements was not at issue: the People were not introducing the evidence to prove that appellant did or did not use the alias Jaspal Singh Mahal in England or that he did or did not attend a birthday party in England on February 8, 1985. The relevance of this evidence was that witnesses at the extradition hearing made those statements on appellant's behalf and, conversely, at trial, appellant was introducing a new, inconsistent defense."

Respondent's argument that these statements were relevant because they were made in appellant's presence reflects the continued reliance by respon-

dent on the statements upon the premise they were attributable to appellant, as if they were adopted by him. Their relevance, as the argument goes, was that appellant had, via the statements of the other witnesses, and the absence of appellant's personal statement to the contrary, presented a false defense in England. However, regardless of how many ways respondent attempts to skin the cat, these statements were nonetheless being admitted as adoptive admissions. They were admitted because appellant had somehow made use of them in England. And this was error. Cross-examination of appellant as to these statements by other witnesses at the extradition hearing was improper upon any theory.

III.-IX.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed and the matter remanded to the trial court for retrial.

Harris, J., and Franson, J.,† concurred.

Respondent's petition for review by the Supreme Court was denied January 15, 1992.

---

*See footnote, *ante*, page 1446.

†Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.